**In the Interest of I.E.P., I.S.P. and I.Z.P.**

**Appeal of S.P., Father.**

Superior Court of Pennsylvania.

Submitted Jan. 6, 2014.
Filed March 7, 2014.

Aaron A. Mixon, Philadelphia, for appellant.

Michael P. Marryshow, Philadelphia, for appellee.

Jeri H. Behrman and Cynthia N. Keller, Philadelphia, for Dept. of Human Services, participating party.

Craig T. Hosay, Philadelphia, for I.E.B.R., participating party.

BEFORE: BENDER, P.J., SHOGAN and FITZGERALD *, JJ.

OPINION BY SHOGAN, J.:

S.P. ("Father") appeals from the orders entered on July 12, 2013, in the Court of Common Pleas of Philadelphia County, involuntarily terminating his parental rights

* Former Justice specially assigned to the Superior Court.

to his three sons, I.E.P., born in July 2003, I.S.P., born in July 2005, and I.Z.P., born in September 2007 (collectively, "Children").[1] We affirm.

The certified record reveals the unique procedural posture of this case. On March 15, 2011, the Philadelphia Department of Human Services, Children and Youth Division ("DHS"), filed petitions for the involuntary termination of parental rights of Father and I.B.R. ("Mother") pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The termination hearing commenced before the Honorable Thomas Nocella on April 23, 2012, and continued on April 25, 2012, June 5, 2012, and October 17, 2012. DHS presented the testimony of Ellen Nelson, a case manager from the Bethana Foster Care Agency; Latifah Chin, the DHS caseworker; and C.C., the kinship foster care mother.[2] Mother testified on her own behalf, and she presented the testimony of Ida Rosado, her counselor in the domestic violence program, and Judy Bunn, her substance abuse counselor. Father testified on his own behalf, and he presented the testimony of Mostafa Easa, his counselor.[3]

At the conclusion of the hearing on October 17, 2012, the parties rested. The trial court directed the parties, on the record and in open court, to submit their arguments by written brief within fifteen days of receipt of the hearing transcripts and scheduled a subsequent hearing for December 18, 2012. N.T., 10/17/12, at 93–95. Sometime between October 17, 2012, and December 18, 2012, the Pennsylvania Supreme Court suspended Judge Nocella, and the case was reassigned to the Honorable Allan L. Tereshko. *See* Trial Court Opinion, 9/4/13, at 1.

Thereafter, on March 19, 2013, Judge Tereshko held a hearing to determine whether the record was sufficient for him to render a decision. Father's counsel argued that "credibility does play an important role."[4] N.T., 3/19/13, at 6. Judge Tereshko took the matter under advisement to review the notes of testimony and determine "how large a role ... credibility plays in this case, whether or not the record is essentially fact driven and the facts are uncontested.... And whether or not the factually driven evidence is sufficient to support a case of clear and con-

1. By orders entered on the same date, the trial court involuntarily terminated the parental rights of Children's mother, I.B.R., whose appeal is addressed by separate decision.

2. In addition, DHS presented the testimony of Becky Rossi, a social worker at Bethana Foster Care Agency, for purposes of Children's safety in their foster home. DHS did not present Ms. Rossi with respect to the termination matter.

3. Mostafa Easa, who had never testified before, held a foreign medical degree but is not licensed to practice medicine in the United States. Father's counsel stated that he was "not asking [Easa] to provide expert testimony," but instead was calling him as "an eyewitness who actually had a caseload and treated [Father]" at PanAmerican Behavioral Health. N.T., 6/5/12, at 16–17. Easa did not provide any testimony regarding Father's diagnoses, medication, or specifics regarding

attendance at counseling sessions. *Id.* at 23–28. He did not have any information from DHS directly and did not review the family service plan objectives. *Id.* at 24–25, 41. He did not know why Children became involved with DHS, did not know the extent of Father's drug use, testifying instead that he believed Father "was cured," and he did not consult with Father's drug and alcohol treatment providers. *Id.* at 29–30, 41. Indeed, in his brief to this Court, Father did not cite to any testimony from Mostafa Easa.

4. Likewise, the record reveals that Mother's counsel, although not present at the hearing, had submitted a letter brief to the trial court with respect to whether the court could render a decision on the termination petitions without having observed the witnesses directly. *See* N.T., 3/19/13, at 3–4.

vincing evidence that termination should occur."[5] N.T., 3/19/13, at 9–10. The trial court concluded as follows:

> After a thorough review of the record and briefs submitted by Counsel, this Court entered ... Findings and [an] Order on July 9, 2013,[6] finding that the Record previously developed was sufficient to proceed, closing the Evidentiary Record, denying the request to proceed de novo and ordering that the hearing scheduled for July 12, 2013 be used to enter final Orders on the outstanding Petition to Involuntarily Terminate Parental Rights. . . .

Trial Court Opinion, 9/4/13, at 1–2.

At the July 12, 2013 hearing, the trial court determined on the record that the evidence established termination under section 2511(a)(1), (2), (5), (8), and (b). *See* N.T., 7/12/13, at 4. Likewise, by orders entered on July 12, 2013, the court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On July 31, 2013, Father filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father presents the following issues, which we have reordered for purposes of appeal:

A. Whether the trial court committed reversible error when it made a finding of facts and rendered a decision as to the custody of [Children] based on the transcripts of the case without observing the testifying witnesses during their testimony, and

did not preside over the matter during the hearing[?]

B. Whether the trial court committed reversible error when it involuntarily terminated [F]ather's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act[,] 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), and (a)(8) as [F]ather made progress towards working and meeting his FSP goals[?]

C. Whether the trial court committed reversible error when it involuntarily terminated [F]ather's parental rights without giving primary consideration to the effect that the termination would have on the developmental[,] physical and emotional needs of [Children] as required by the Adoption Act[,] 23 Pa.C.S.A. § 2511(b)?

Father's brief at 2.

██ We review this appeal according to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa.2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.; [In re ] R.I.S.*, [614 Pa. 275] 36 A.3d [567,]

---

5. In addition, counsel for DHS informed the court that she had not submitted briefs as ordered by Judge Nocella. Judge Tereshko permitted counsel to submit a substantive brief as well as a written response to Mother's letter brief with respect to whether the court

may render a decision on the termination petitions without determining credibility of the witnesses. *See* N.T., 3/19/13, at 10.

6. The July 9, 2013 order referenced by the court is not included in the certified record.

572 [(Pa.2011) (plurality) ]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.; see also Samuel–Bassett v. Kia Motors America, Inc.* [613 Pa. 371], 34 A.3d 1, 51 ( [Pa.]2011); *Christianson v. Ely,* 575 Pa. 647, 838 A.2d 630, 634 (2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.,* there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.,* 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio,* 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa.1994).

*In re Adoption of S.P.,* 616 Pa. 309, 47 A.3d 817, 826–827 (2012).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.,* 923 A.2d 505, 511 (Pa.Super.2007) (citing 23 Pa.C.S.A. § 2511). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.,* 985 A.2d 273, 276 (Pa.Super.2009).

This Court must agree with only one subsection of 23 Pa.C.S.A. § 2511(a), in addition to subsection 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.,* 843 A.2d 380, 384 (Pa.Super.2004) (*en banc* ). Herein, we review the orders pursuant to section 2511(a)(8) and (b), which provide as follows: [7]

---

**7.** On the first day of the hearing, the trial court considered DHS's motion *in limine,* which is not included in the certified record. The focus of the discussion centered on the parents' ability to present evidence beyond the time of notice of the filing of the termination petitions. In light of the following language in 23 Pa.C.S.A. § 2511(b) (emphasis

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

This Court has stated:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8),

the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275–1276 (Pa.Super.2003); 23 Pa.C.S.A. § 2511(a)(8).

"Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super.2003). Once the twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of DHS supplied over a realistic period. *Id.* The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super.2009). This Court has acknowledged:

[T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the

added), "With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court **shall not consider** any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition," the trial court stated, "I find, ... because of the wording of 'shall' that I am not going to permit any testimony by Father ...

concerning any ... efforts [he] took subsequent to the filing of the notice of termination." N.T., 4/23/12, at 11–12. Father acknowledged in his brief that "the trial court did consider all efforts made and/or initiated by Father prior to July 5, 2011." Father's Brief at 6 n. 1. *See* N.T., 4/23/12, at 5–12; Child Advocate's Brief at 6; DHS's Brief at 19.

parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re J.F.M.*, 71 A.3d 989, 997 (Pa.Super.2013) (quoting *I.J.*, 972 A.2d at 11–12).

With respect to the "needs and welfare" analysis pertinent to section 2511(a)(8) and (b), we have observed:

[I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the *focus in* Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008–1009 (Pa.Super.2008) (*en banc*) (citations omitted). "Section 2511(a)(8) does not require an evaluation of the remedial efforts of either the parent or DHS." *In re B.C.*, 36 A.3d 601, 611 (Pa.Super.2012) (citing *C.L.G.*, 956 A.2d at 1007).

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super.2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the *nature and status of the parent-child* bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762–63 (Pa.Super.2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super.2010).

■ We begin by addressing the procedural issue presented herein. Father argues the trial court erred when it made findings of facts and rendered a decision based on the record without having personally observed the witnesses. Father asserts that credibility findings were necessary because he alleged bias by the agency workers involved in this case. In consideration of all of the facts of this case, we do not agree.

In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court explained as follows:

> [A]fter reviewing the transcripts as well as briefs submitted by counsel on the issue of whether or not this Court should proceed de novo, the Court found that the case was factually driven and did not turn on the credibility of the testifying witnesses in any significant way.... The ability to observe the witnesses live would not have altered this Court's decision as the evidence in support of termination of Father's parental rights was overwhelming and clearly set forth in the evidentiary record. Therefore, this Court found that it would be in the best interest of [C]hildren to utilize the transcripts so as not to further delay permanency for the [C]hildren. **Given that [C]hildren have been in care since September of 2009,** Petitions for Involuntary Termination of Parental Rights were filed on March 15, 2011, and the previous Termination hearing took four court dates and six months to complete, the Court concluded that it would not be in the best interest of [C]hildren to further delay permanency as the evidence against Father was overwhelming and clearly set forth in the transcripts.

Trial Court Opinion, 9/4/13, at 10–11 (emphasis added). Upon thorough review, we discern no error by the trial court in deciding this termination of parental rights case on the basis of the transcripts and the briefs submitted by counsel.

As noted by the trial court, Father cited no case prohibiting Judge Tereshko from deciding the instant matter based upon the hearings already completed. Similarly, Father cites no such case law in his brief to this Court. In light of the trial court's conclusion that this matter was fact-driven, the particular nuances of this case compelled the court's progression to a speedy decision. Children had been abandoned by parents since 2009, when Children were only two, four, and six years old. N.T., 4/25/12, at 18–20. They are now ages six, eight, and ten. For unexplained reasons, the hearings in this matter were spread out over a six-month period, thereby further delaying disposition.

Judge Tereshko completed a comprehensive review of the record and examined all evidentiary resources presented to Judge Nocella. He balanced the competing factors and reached a reflected conclusion that he could make a considered decision in this case. We have not been presented with any conflicting evidence that the decision to go forward was an abuse of discretion, and we find none.

■ Substantively, Father argues the evidence is insufficient to support termination pursuant to subsections 2511(a) and (b). Specifically, with respect to subsection 2511(a)(8), Father avers the evidence is insufficient to support termination with respect to the third factor, *i.e.*, termination of parental rights would best serve the needs and welfare of Children. Father contends the evidence is insufficient "because the [t]rial [c]ourt did not rely on an expert report to show the lack of a bond between [F]ather and [C]hildren." Father's Brief at 9. Likewise, with respect to subsection 2511(b), Father posits, "[T]here has not been adequate consideration of the emotional needs of [C]hildren because the court did not hear expert testimony from a licensed expert in family therapy who could render expert testimony as to whether a bond existed between [F]ather and [C]hildren." *Id.* at 13. Our review of the record compels our disagreement.

■ It is well-settled that, when evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b)

does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super.2010) (internal citations omitted). In this matter, the DHS caseworker and foster care case manager testified regarding the bond, if any, between Father and Children. Moreover, upon thorough review, we conclude the trial court's findings are supported by the record, and its decision to terminate Father's parental rights pursuant to section 2511(a)(8) and (b) is reasonable.

In its Pa.R.A.P. 1925(a) opinion, the trial court summarized the basis for its decision as follows:

> The facts speak for themselves. Father failed to make any legitimate effort to remedy the conditions that brought the [C]hildren into care until after the Petition for Involuntary Termination of Parental Rights was filed, and even then, there was evidence presented that he was not able to implement any significant changes in his life as a result of his participation in the various programs required by DHS. Father has failed to take responsibility for the removal of [C]hildren and continues to blame the social workers assigned to his case for his failure to progress. While Father did visit the [C]hildren fairly consistently, there was testimony that the [C]hildren frequently expressed frustration and aggression toward Father. Father never progressed to unsupervised visits during the almost four years [C]hildren have been in care. There was testimony that [C]hildren are in a loving and stable home where their needs are consistently met and that they have bonded to the foster parents. Permanency for these three children should not be delayed any further, and it would be in their best interest to be adopted by their foster parents.

Trial Court Opinion, 9/4/13, at 20–21. We discern no abuse of discretion by the trial court.

Notably, in connection with DHS's motion *in limine*, DHS proceeded on grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(1), (8), and (b). As such, the trial court precluded testimony by Father concerning his efforts to remedy the conditions described in section 2511(a)(1) and (8) that were first initiated subsequent to the notice of the filing of the termination petitions. *See* N.T., 4/23/12, at 11–12; *see also* 23 Pa.C.S.A. § 2511(b) (providing, "With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court **shall not** consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition") (emphasis added). Here, Father received notice on July 5, 2011. N.T., 4/23/12, at 16.

Latifah Chin, the DHS caseworker for this family since November 2009, testified that on September 24, 2009, DHS received a report alleging Mother and Father had left Children with Mother's sister, who was fourteen years old, and "refused to take the children with them." N.T., 4/25/12, at 18–19. On September 29, 2009, Children were adjudicated dependent, at which time they were ages two, four, and six. *Id.* at 20. Children have resided in kinship care with their maternal aunt and uncle, who are an adoptive resource, since that time. N.T., 4/23/12, at 44.

Ms. Chin testified that the permanency plan for Children was reunification. N.T., 4/25/12, at 20–21. DHS established Family Service Plan ("FSP") goals for Father on October 28, 2009, which included maintaining visitation with Children, participating in drug and alcohol treatment, and participating in drug screening. *Id.* at 21.

Ms. Chin testified that shortly after becoming the caseworker for this family, Father stated that he had "issues with marijuana use and needed treatment." N.T., 4/25/12, at 25. Further, Father was behind in rental and utility payments for the house he shared with Mother. *Id.* at 26. Ms. Chin testified that Father and Mother were evicted shortly after Children's placement. *Id.* at 56. In addition, Ms. Chin testified that Father admitted "to previous domestic violence issues. . . ." *Id.* at 27–28. Father told Ms. Chin that he "was . . . seeking mental health treatment." *Id.* at 28.

The following additional FSP goals were established for Father: participate in domestic violence counseling; continue mental health treatment and follow through with the recommendations; maintain appropriate housing; and maintain appropriate employment. N.T., 4/25/12, at 25–30. Father's FSP goals were revised on December 23, 2010, to include as follows: attend drug and alcohol treatment; stabilize mental health problems and follow through with recommendations; maintain adequate housing; maintain visitation with Children; and comply with the previous FSP goals. *Id.* at 58–59. To meet his FSP goals, Ms. Chin testified that she referred Father to the Achieving Reunification Center ("ARC") for parenting classes, anger management, housing, employment, and drug and alcohol treatment. *Id.* at 37.

Ms. Chin testified on direct examination that by July 2011, when Father was given notice of the filing of the termination petitions, his compliance with his FSP objectives was moderate. N.T., 4/25/12, at 67. Father had completed parenting classes, anger management counseling, and a money management course. *Id.* at 32. However, Ms. Chin testified that Father "failed to comply with the drug and alcohol piece,

to provide the random drug screens; drug and alcohol [issues], inadequate housing, [and] lack of employment were the other outstanding objectives." *Id.* at 67–68.

Ms. Chin testified that as of July 2011, she had the following concerns regarding Father's substance abuse:

> At that time, Father . . . wasn't in a program. He had not provided documentation of completion of a program or steady attendance of a program, and there were CEU [Clinical Evaluation Unit] screens that were positive around that time, as well.

> And also, Father was court ordered to do random drug screenings and he was not compliant with that.

N.T., 4/25/12, at 50–51. Moreover, Father had a positive drug screen for marijuana in June 2011. *Id.* at 169. Father testified on cross-examination by DHS counsel that in June 2011, he was arrested and convicted of possession of marijuana. *Id.* at 204–207.

In addition, Ms. Chin testified that as of July 2011, Father's housing was not appropriate for Children because it was too small. She further testified that "Father had the same income as . . . when the case opened up, and we had concerns given his history with evictions." N.T., 4/25/12, at 60.

On cross-examination by Father's counsel, Ms. Chin admitted that Father complied with his FSP objectives involving domestic violence, mental health, and he attended his supervised visits with Children throughout the history of the case. N.T., 4/25/12, at 133–134.

Ms. Chin explained that she visits Children in their kinship foster home one to two times per month. N.T., 4/25/12, at 61. Between September 2009 and the beginning of July 2011, the Children displayed

"a loving relationship with their aunt and uncle." Ms. Chin continued as follows:

They participate in activities together. I've observed them eating dinner together as a family. I've been there on occasions where [C]hildren needed to be redirected, it was appropriate by the kinship parents.

They participate in their school activities, assure that they're doing their homework, and just the overall interaction is good with [C]hildren and the kinship parents.

*Id.* at 62. When asked whether Children would suffer any serious harm if Father's parental rights were terminated, Ms. Chin responded, "No ... Because [C]hildren are very stable in their environment. They identify their kinship parents as their parents; they're in a structured environment; they're used to a certain routine, and they're doing well and have been progressing well in the home since being in care." N.T., 4/25/12, at 66–67.

DHS also presented the testimony of Ellen Nelson, the foster care case manager at Bethana Foster Care Agency. She described her duties as making sure that Children's needs were being met, providing supervised visitation between Children and their parents, and helping parents achieve their FSP and ISP goals. N.T., 4/23/12, at 13–14.

Ms. Nelson developed Father's individual service plan ("ISP") goals, which were similar to the FSP goals, as follows: participate in a drug and alcohol program; participate in parenting classes; attend weekly supervised visits with the Children; maintain appropriate housing; maintain appropriate employment; and attend domestic violence counseling. N.T., 4/23/12, at 14. Ms. Nelson testified that by July 2011, the ISP goals of drug and alcohol treatment, stable housing, and employment remained outstanding. *Id.* at 51.

When asked about Father's compliance level with ISP objectives, Ms. Nelson opined:

I would say he was not compliant because there [were] only two certificates of all of the ISP objectives and FSP objectives, and even with the parenting certificate, he wasn't able to put those skills that he learned in the course into practice during the visits.

N.T., 4/23/12, at 68. She testified consistently about Father's failure to achieve the plans' goals. With respect to drug and alcohol treatment, Ms. Nelson stated as follows:

Q. And during your time on the case in 2010 and until July of 2011, did you discuss with [Father] any substance abuse treatment he was receiving?

A. Yes, I did. There were several times that he would enroll right before the Court hearings, but then there was no follow-through after the Court hearings.

N.T., 4/23/12, at 23–24. She testified that Father did not complete any substance abuse programs prior to July 2011. *Id.* at 112.

With respect to housing, Ms. Nelson testified that Father was evicted at the time Children were placed in 2009, and he was evicted again in July 2010, because he was unable to pay his rent. N.T., 4/23/12, at 16, 112. Regarding employment, Ms. Nelson testified on cross-examination that Father told her he was receiving supplemental security income due to a nerve issue, "but he also stated that he desired to also find employment." *Id.* at 58, 113.

Ms. Nelson testified that from September 2009 to July 2011, Father attended forty out of forty-five supervised visits with Children, which she regularly observed. N.T., 4/23/12, at 22, 24–25. She explained his visits did not progress to

unsupervised visits "due to dirty urines." *Id.* at 22–23. Although Father complied with the ISP goal of participating in a parenting program in 2010, Ms. Nelson testified that "he wasn't able to put those skills that he learned in the course into practice during the visits." N.T., 4/23/12, at 57, 68. Specifically, Ms. Nelson related that Father struggled with disciplining the Children during the supervised visits. *Id.* at 69, 71.

Father's interactions with the oldest child, I.E.P., "have been difficult, due to Father promising certain things during the visit. [I.E.P.] took that very harshly and was very upset and disappointed, things that his Father told him, and it affected him very negatively." N.T., 4/23/12 at 25. Ms. Nelson testified that beginning in November 2010, I.E.P. expressed that he did not want to visit with Father. *Id.* at 34. I.E.P. continued to attend visits intermittently until June 2011, when he stopped participating completely. *Id.* at 35. Ms. Nelson noted that I.E.P. participates in individual therapy "to work through those feelings of anger and disappointment." *Id.* at 44.

Ms. Nelson also explained that from 2010 through July 2011, I.S.P., the middle child, "after [supervised] visits, would become very aggressive. He would be breaking things in the [foster parents'] home, as far as punching the walls, breaking the bunk bed; he … also had an issue of peeing in the different areas of the home that were not the bathroom." N.T., 4/23/12, at 38. Ms. Nelson testified that before July 2011, I.S.P.'s foster parents "worked very hard, very consistently with him and were able to digress those behaviors." *Id.* at 38–39.

Regarding I.Z.P., the youngest child, Ms. Nelson testified that he displays aggression toward Father during visits. When I.Z.P. does not get his way, he "will

come up behind Father, have aggression in his face and hit him very hard on the back." N.T., 4/23/12, at 26. Her testimony continued as follows:

> THE COURT: How does the child's face appear to you?
>
> THE WITNESS: He becomes very tense; his eyes get squinty and he's like standing behind Father thinking about what he's going to do for a minute, and then he lashes out.
>
> THE COURT: You've seen this?
>
> THE WITNESS: Yes.
>
> THE COURT: How many occasions?
>
> THE WITNESS: Very frequently, almost every visit.

*Id.* at 27.

Ms. Nelson testified that from the time of placement until July 2011, Children separated easily from Father at the end of the visits. She testified that "they don't cry, they leave with their kinship parents after the visit." N.T., 4/23/12, at 36–37. Moreover, Ms. Nelson testified Children have a parent-child relationship with their kinship foster parents. *Id.* at 40–41. She opined it would be detrimental to remove Children from their kinship foster home, but it was not detrimental to them to end their legal relationship with their parents. *Id.* at 45–46. Ms. Nelson testified that adoption is in Children's best interests for the following reasons:

> I have seen, over the time of this case being in DHS, that the parents are unable to meet their ISP and FSP objectives, unable to provide stable housing and income, a life free of drugs to be able to offer these boys a consistent and stable home.
>
> The home that [Children] reside in now is stable and consistent, very loving.

The boys feel comfortable there, and I see the boys staying there.

N.T., 4/23/12, at 43.

We conclude that the foregoing testimonial evidence supports the trial court's determination that Father's conduct warrants termination pursuant to § 2511(a)(8). By July 2011, when Father was given notice of the filing of the termination petitions, Children had been in placement for more than twenty-one months. The conditions that led to Children's placement continued to exist in that Father had failed to meet his FSP and ISP objectives relating to drug and alcohol treatment, housing, and employment. Finally, the testimonial evidence overwhelmingly demonstrates that termination of Father's parental rights would best serve the needs and welfare of the Children.

Likewise, we conclude that the totality of the record evidence supports the court's decision that terminating Father's parental rights would serve the developmental, physical, and emotional needs and welfare of Children pursuant to § 2511(b). Accordingly, we affirm the order pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).

Orders affirmed.

FITZGERALD, J., Concurs in the Result.