J-S25033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: K.O.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1079 EDA 2024 |

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s): A2023-0044

| | | |
|---|---|---|
| IN RE: V.C.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1081 EDA 2024 |

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s): A2023-0045

| | | |
|---|---|---|
| IN RE: H.S.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1083 EDA 2024 |

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s): A2023-0046

| | | |
|---|---|---|
| IN RE: I.A.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

J-S25033-24

APPEAL OF: C.C., FATHER

: No. 1085 EDA 2024

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s): A2023-0047

IN RE: L.S.C., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA

APPEAL OF: C.C., FATHER

: No. 1087 EDA 2024

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s): A2023-0048

IN RE: N.C.C., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA

APPEAL OF: C.C., FATHER

: No. 1089 EDA 2024

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s): A2024-0002

BEFORE: DUBOW, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY BECK, J.: **FILED JULY 29, 2024**

- 2 -

C.C. ("Father") appeals from the decrees entered by the Northampton County Court of Common Pleas ("orphans' court") terminating his parental rights to six of his children, K.O.C., born June 2020, V.C.C., born June 2019, H.S.C., born May 2018, N.C.C., born July 2015, I.A.C., born July 2014, and L.S.C., born June 2013 (collectively "Children"), pursuant to pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[1] Because we conclude that the orphans' court did not abuse its discretion in terminating Father's parental rights, we affirm.

Mother and Father have thirteen children together.[2] Mother has two older children, including D.G., who was born in 2004. Mother and Father supported their household solely with government benefits. After their house burned down in 2017, the family moved into a multi-story rowhouse with one bathroom at 714 Broadway in Bethlehem.

In 2021, Mother, Father, their thirteen minor children, D.G., and at least two dogs were living in the 714 Broadway home. Notably, four of the older

_____

[1] The orphans' court also terminated the parental rights of J.L.G. ("Mother") to Children. Mother appealed the termination decrees, and her appeals are currently pending before this Court.

[2] Additionally, the Northampton County Children, Youth, and Families Division ("CYF") filed petitions to terminate the parental rights of Mother and Father to E.J.C. and Z.K.-E.C. These petitions are not at issue in this case. CYF did not file petitions to terminate parents' rights with respect to five of their children, C.L.C., born May 2005, R.C., born May 2006, S.C., born April 2007, T.C., born December 2008, and J.C., born December 2009, based on the ages of those children.

boys shared a room, the older girls shared a room, Mother, Father, and the three youngest children shared a room, and D.G. lived in the attic. Two of Mother and Father's older daughters, S.C. and T.C., told their parents that D.G. was sexually abusing them. Father did not contact law enforcement, but instead installed cameras in the home, put locks on the girls' bedroom door, and sent the six girls, including L.S.C. and I.A.C., to stay with his mother, while Mother investigated the allegations made against D.G. As Father did not see anything concerning on the cameras, and Mother did not believe her older daughters, the girls returned to the 714 Broadway home in the fall of 2021.

In October 2021, CYF received a child protective services ("CPS") referral of alleged sexual abuse by D.G. CYF had additional concerns of medical and dental neglect for the younger children, at least one child went to school hungry, and deplorable home conditions at 714 Broadway. CYF child abuse investigator, Heather Major ("Major"), accompanied by the Bethlehem police to 714 Broadway on the evening of October 27, 2021. Major found that her shoes stuck to the grime on the floor as they toured the home and the odors throughout the home were unbearable. She found the home contained flies; the kitchen contained rotting food, a container filled with six inches of yellow fluid that smelled like urine, and was infested with insects; mushrooms were growing in the basement; there was mold throughout the home; and

one room had animal waste. Additionally, Major noted that two entire rooms contained Mother's hoarded baby clothing and other items.

After CYF sought to establish a safety plan for Children, Mother and Father agreed to a plan for twenty-four hours that required Mother to leave the home with the three youngest children, moved D.G. in with his grandmother, and Father to stay in the home with the remaining ten children. Subsequently, Major and the police brought S.C. and T.C. to the police station for forensic interviews. The girls disclosed multiple incidents of sexual abuse and disclosed messages they had sent to Mother and Father detailing the abuse. Based upon Major's home visit and the interviews disclosing the sexual abuse, CYF obtained thirteen emergency orders for protective custody due to Mother and Father's lack of protective capacities and ability to control Children, and the state of the home. CYF was unable to place the thirteen children together, and instead placed them into groups of two or three in separate foster homes. Relevantly, K.O.C., V.C.C., and H.S.C. were placed together.[3] I.A.C. was placed with L.S.C. N.C.C. was placed with Z.C., who is not a part of this appeal.

On October 29, 2021, D.G. admitted to sexually abusing N.C.C., L.S.C., and H.S.C., and six other siblings during an interview with the police. Some of the children subsequently confirmed that they had either been sexually

_____

[3] These children were removed wearing soiled clothing and diapers and had lice infestations.

abused by D.G. or observed D.G. abusing their siblings.[4]  On November 2, 2021, the Commonwealth charged Father with multiple criminal counts, including endangering the welfare of children.  Father was imprisoned in Northampton County Prison in lieu of $500,000 bail.[5]  CYF then filed thirteen petitions for the adjudication of dependency and disposition orders requesting removal.  On November 12, 2021, the Hearing Officer confirmed the adjudication of removal of the thirteen children, finding clear and convincing evidence to substantiate the allegations based on the findings of abuse, neglect and dependency, and that it was in the best interests of the thirteen children to be removed from their parents' care.  Further, the dependency court issued a permanency plan directing Father to complete a mental health evaluation, complete an evaluation to determine his parental abilities, and obtain stable, legitimate income and housing for a period of six months.

In February 2022, Father was released from jail on bond, and moved in with his mother and minor half-sibling at 900 Broadway.  Father's mother had obtained this home with a section VIII voucher.  On March 10, 2022, Father

---

[4]  The police arrested D.G. and the Commonwealth charged him with numerous crimes.  D.G. ultimately pled guilty to seven counts of indecent assault of a child less than 13 years of age.  The trial court sentenced D.G. to seven to fourteen years in prison, followed by seven years of probation.

[5] CYF conducted assessments, including interviews of the children, Mother, Father and D.G. and came to conclusions regarding the CPS referrals of sexual abuse.  The report concerning Father was indicated for causing sexual abuse or exploitation by indecent assault, perpetrator by omission, with regard to N.C.C., L.S.C., and H.S.C.

underwent a court-ordered mental health evaluation by PA Forensics, which concluded that Father suffered from depression, and recommended that Father be given a polygraph test to determine whether he had engaged in inappropriate acts of sexual abuse of his children, and that he would be a good candidate for electroconvulsive therapy (ECT) due to his depression. PA Forensics further recommended that Father undergo family therapy and protective parenting classes.

On March 25, 2022, the dependency court held a permanency review hearing, at which it found that Children should remain in foster care, noting that although Father had completed a mental health evaluation, he failed to remain employed and the family home at 714 Broadway had been condemned. The court reiterated to Father that he had to comply with its November 2021 directives. Ultimately, Father failed to undergo a polygraph examination and ECT, on the advice of his therapist. On July 15, 2022, the dependency court found that the continuation of dependency was necessary and Children should remain in foster case, as Father was still unemployed and was living with his mother. On November 1, 2022, Father entered a negotiated guilty plea to endangering the welfare of children, and the trial court imposed a sentence of three to twelve months of incarceration, with credit for time served.[6] On

_____

[6] Mother was also arrested and the Commonwealth charged her with numerous crimes, including terroristic threats and endangering the welfare ofchildren. In November 2021, Mother was released on bond, but was
*(Footnote Continued Next Page)*

December 2, 2022, the dependency court noted that Father's housing was inadequate for all of his children. On March 24, 2023, the dependency' court held another permanency review hearing and found Father was still unemployed and was living with his mother. The court acknowledged the progress made by Father, but noted that he had not fulfilled his mental health recommendations.

On July 13, 2023, CYF filed six separate petitions to terminate Father's parental rights to each child. The case proceeded to a hearing, after which, the orphans' court granted the petitions and terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511 (a)(1), (2), (5), (8) and (b). Father filed a timely appeal; Father and the orphans' court complied with Pa.R.A.P. 1925.

Father raises the following questions for our review:

1. Whether the [orphans'] court erred in finding that Father caused the child/children to be without essential parental care, substance, or control necessary for K.O.C., V.C.C., H.S.C., I.A.C., L.S.C., and N.C.C.[,] the minor children's mental and physical wellbeing and the conditions of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by Father.

2. Whether the [orphans'] court erred in finding that [Father] had evidenced a settled purpose of relinquishing his parental claim to K.O.C., V.C.C., H.S.C., I.A.C., L.S.C., and N.C.O.[,] the minor children or failed to perform his parental duties without adequate explanation for his conduct.

_____

prohibited from contacting her minor children. On March 17, 2023, Mother entered a negotiated plea of nolo contendere to intimidating a witness and guilty to endangering the welfare of children. The trial court sentenced Mother to three to twelve months of incarceration, followed by two years of probation. As a result of the sentence, Mother was reincarcerated.

3.	Whether the [orphans'] court erred in finding that K.O.C., V.C.C., H.S.C., I.A.C., L.S.C., and N.C.O.[,] minor children had been removed from Father for a period of at least six months, and the conditions which led to the removal or placement of the K.O.C., V.C.C., H.S.C., I.A.C., L.S.C., and N.C.O., the minor children continue to exist and Father cannot or will not remedy those conditions within a reasonable period of time, and termination of his parental rights best serves the needs and welfare of [] K.O.C., V.C.C., H.S.C., I.A.C., L.S.C., and N.C.O[,] the minor children.

4.	Whether the [orphans'] court erred in finding that K.O.C., V.C.C., H.S.C., I.A.C., L.S.C., and N.C.O.[,] the minor children had been removed from Father for a period of at least twelve months, and the conditions which led to the removal or placement of K.O.C., V.C.C., H.S.C., I.A.C., L.S.C., and N.C.O.[,] the minor children continue to exist, and [Father] cannot or will not remedy those conditions within a reasonable period of time, and termination of parental rights best serves the needs and welfare of [] K.O.C., V.C.C., H.S.C., I.A.C., L.S.C., and N.C.O.[,] the minor children.

5.	Whether the [orphans'] court erred in finding that the termination of parental rights of father will meet the needs and welfare of the child/children.

Father's Brief at 5-6 (some capitalization omitted).

"In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021).

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re Adoption of B.G.S.*, 245 A.3d 700, 704 (Pa. Super. 2021) (citation omitted).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a bifurcated analysis. *C.M.*, 255 A.3d at 359. "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." *In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019). If the orphans' court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In Int. of J.M.*, 166 A.3d 408, 423 (Pa. Super. 2017) (citation omitted).

As stated above, the orphans' court terminated Father's rights to Children pursuant to subsections (1), (2), (5), and (8) of section 2511(a).

"This Court may affirm the [orphans'] court's decision regarding the termination of parental rights with regard to any one subsection of [s]ection 2511(a)." *In re J.F.M.*, 71 A.3d 989, 992 (Pa. Super. 2013). We focus our analysis on section 2511(a)(8).

Father argues that the orphans' court abused its discretion by terminating his parental rights pursuant to section 2511(a)(8) because of his ongoing efforts to gain employment and obtain housing. Father's Brief at 19-20. Father contends that the evidence of record established that he would do "whatever he could under his particular circumstances to be there for [Children]." *Id.* at 19. Father notes that he participated in all of the programs provided to him and his efforts demonstrated "an ongoing desire to become financially more stable and to perform his parental duties for his children." *Id.*

To terminate parental rights under section 2511(a)(8), the petitioner must prove: (1) the child has been removed from parental care for 12 months or more; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008); *see also* 23 Pa.C.S. § 2511(a)(8). Notably, this subsection "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children." *Interest of M.E.*, 283 A.3d 820, 832 (Pa. Super. 2022). Rather, "the relevant inquiry regarding the

second prong of [section] 2511(a)(8) is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Id.* (quotation marks and brackets omitted). Further, "[w]ith respect to any petition filed pursuant to subsection [(a)(8)], the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b); *see also T.S.M.*, 71 A.3d at 255 n.8.

Here, Major testified that in October 2021, CYF received a CPS referral about sexual abuse in Mother and Father's home perpetrated by D.G. N.T., 2/12/2024, at 65-66. Upon entering the home at 714 Broadway, Major noted that the home was cluttered, and that Mother had a hoarding room which contained baby items stacked from the floor to the ceiling in some areas. *Id.* at 73-74, 77. She noted a strong odor in the home. *Id.* at 74. Major indicated the home had a lot of flies; there were sticky fly traps full of flies everywhere; the bathroom was leaking a yellow liquid, which smelled like urine, into the kitchen; there was food scattered all over the kitchen, as well as rotting food; and animal waste was found in one of the rooms. *Id.* at 74-78, 81-83. She further described Mother and Father's room to include two Pack N' Plays which had holes in them, dirty blankets, old food, and baby items strewn across the floor. *Id.* at 84. Major testified that the older girls shared their bedroom with two dogs, and noted that the dog cages were filthy, there were not enough

mattresses for each of the girls, and the mattresses were bare and ripped. *Id.* at 86-87, 90. Major described the boys' room to be cluttered as well. *Id.* at 89. She noted the basement had mushrooms growing out of the floor and an excessive amount of mold. *Id.* at 86, 111. Major indicated that the younger children were dirty, smelled and needed a bath, and some of the children had lice. *Id.* at 93-94. In her view, the home was "one of the more deplorable homes I have ever been in in my time as a caseworker." *Id.* at 77; *see also id.* at 89 (noting that the home "was unfit for a child or anybody to properly reside in"), 111 (Stating the home "is the worst I have ever seen. This was the only home that I have ever had to throw articles of my clothing away because I could not get the odor out of my clothes.").

Additionally, Major testified that she participated in the interviews of S.C. and T.C., where they disclosed the sexual abuse by D.G., and further noted that all of the children were sexually abused or had observed sexual abuse. *Id.* at 95-97, 105-06; *see also id.* at 91 (noting Mother indicated she did not believe the allegations and Father denied knowing about the allegations, but acknowledged that they had removed the girls from the home over the summer); *id.* at 97 (stating that an emergency order for all thirteen children was obtained following the disclosures); *id.* at 108, CYF Ex. 4 (certified criminal record of D.G.).

Shakira Roseway ("Roseway"), a CYF caseworker, testified that she received Mother's and Father's case in July 2022. *Id.* at 128. When she

received the case, Father had no visits with Children. *Id.* at 131. When Father began visits with Children, they were once a month and all visits were supervised. *Id.* at 131, 134; *see also id.* at 135 (noting Father continued the visits with Mother after she was released from prison). Father attended all scheduled visits. *Id.* at 150; *see also id.* at 151 (noting Children were excited to see Father). Roseway described the visits as chaotic and the caseworkers had to redirect Children. *Id.* at 132; *see also id.* at 144-45 (highlighting that Father was on the phone with Mother during the visits, and that Father would improperly tell all of the children that they had a home and would be together at a certain time). Roseway noted that Father mostly engaged with the younger children during the visits. *Id.* at 133. She stated, however, that when Children got together, they usually focused on each other, and their interactions with Father and Mother were limited. *Id.* at 146-47, 151. Roseway emphasized that Children were upset when they had to leave each other at the end of the visits. *Id.* at 151-52; *see also id.* at 152 (noting Children hugged Father upon leaving the visit, but "most of their emotion was geared towards each other"). Further, Children's behavior was poor after visits with their parents. *Id.* at 154, 155-56; *see also id.* at 154 (detailing accounts that the parents would tell Children to be disruptive in their foster homes, and that they did not need to listen to their foster parents).

Roseway further testified that Father lived in his mother's home, which had three floors, three bedrooms, one full bathroom, a powder room, and an

attic. *Id.* at 137. She described this home as cluttered and dirty. *Id.* at 138. She indicated Father and Mother's plan was to reunify with all of the children at Father's mother's home, with the nine girls living in the attic, and the four boys in a bedroom upstairs. *Id.* Roseway noted that the home did not have necessary furniture or beds for such a plan. *Id.* at 139. She testified that CYF discussed the furniture needed to bring all of the children to the home, and a lease indicating that everyone could live in the home. *Id.* at 140. Roseway stated there was never any communication from Mother or Father that the home could house over fifteen people. *Id.*

Roseway further testified that Father did not have a car or a job, and that he had applied for a job on only one occasion. *Id.* Roseway indicated that the parents would have to have jobs supporting themselves before Children could be returned to them. *Id.* at 145. She stated that Father was selling plasma for money. *Id.* at 152, 157.

Jennifer Lorah ("Lorah"), a CYF caseworker, testified that she began working with Father and Children in October 2023. *Id.* at 162-63. Lorah noted that N.C.C. is always upset when leaving his siblings during visits, but that he wishes to be adopted by his foster parents, who are an adoptive resource. *Id.* at 167, 172. She further stated that L.S.C. and I.A.C. both sought to be adopted by their foster parents, noting both are doing well in school and happy. *Id.* at 172-73. Lorah indicated that the three youngest children are placed together and are doing well in that placement. *Id.* at 173.

None of Children's therapists or service providers recommend reunification with Mother and Father. *Id.* at 191.

Lorah additionally noted that Father's housing had not changed, and that she discussed with Father the changes that would need to be made in his mother's home to make it a return resource for all of the children. *Id.* at 185-86. Lorah also told Father that he had to obtain a lease from the landlord which would allow all of the children to live in the home. *Id.* at 187; *see also id.* at 205-06 (noting that it was unclear whether the City of Bethlehem would allow occupancy of parents and all of the children in the home). Lorah testified that Father donated plasma for money, and that he was going on job interviews but was having difficulty getting a job because of his felony conviction. *Id.* at 189. Lorah stated that Father had not completed all of the objectives in the permanency plan by failing to obtain ECT therapy, stable housing, or employment. *Id.* at 191, 203.

Father testified that, with regard to his housing, he was unable to obtain verification from the landlord that he and Mother could live in the home with all of the children. *Id.* at 255-56. Father indicated, however, he had made plans with Lehigh Families to obtain furniture for Children to move into the home. *Id.* at 263-64. Father noted he was aggressively looking for employment and had done about twenty interviews, but he was unable to find employment. *Id.* at 257; *see also id.* at 258 (stating he has not had a full time job since 2016). He stated that he sold his plasma five or six times a

month to make money. *Id.* at 260. Father admitted he would not be able to care for Children without a job. *Id.* at 258. Father testified that he loves Children and that although a lot of "horrible and messed up things" had occurred, he was hoping to support them. *Id.* at 260.

Based upon our review of the record, we agree with the orphans' court that CYF met its burden of proving the first two prongs of section 2511(a)(8) by clear and convincing evidence. Children were removed from Father's care in October 2021, which exceeds the twelve-month requirement imposed under section 2511(a)(8), and the conditions leading to Children's removal continue to exist. The record establishes that Children were placed in foster care because of deplorable housing conditions, sexual abuse by their older sibling while in Mother and Father's care, Father's mental health issues, and Father's inability to obtain stable employment. Although the evidence reflects that while there has been some compliance by Father to complete his objectives, including obtaining mental health treatment, there has not been enough progress to enable reunification of Children with him. *See In re Adoption of C.J.P.*, 114 A.3d 1046, 1051 (Pa. Super. 2015) (noting a parent's willingness to make progress or remedy the conditions that led to placement is irrelevant to a section 2511(a)(8) analysis, as the focus is whether the conditions leading to placement still existed). Indeed, Father has not obtained stable housing that could allow Children to live with him, nor has he obtained any employment to be able to provide for Children. In fact, at the termination

hearing, Father admitted that he had not obtained permission from his mother's landlord to have all of the children living in the house and that he had been unable to find a job. It is well settled that "a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities." *In re I.E.P.*, 87 A.3d 340, 345-46 (Pa. Super. 2014) (citation omitted). Thus, the record supports a finding that Father largely has not addressed, let alone remedied, the concerns that resulted in Children's removal from his care, and the orphans' court did not err in finding clear and convincing evidence to satisfy termination under the first two prongs of section 2511(a)(8).

We next consider whether the record supports the orphans' court's conclusion that there was clear and convincing evidence that termination best serves Children's needs and welfare pursuant to the third prong of section 2511(a)(8) and section 2511(b).[7]

Section 2511(b) provides:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as

---

[7] Although separately enumerated, this Court has interpreted the needs and welfare analyses required under subsections (a)(8) and (b) to utilize the same legal standards and to be based upon the same evidence. *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 448 (Pa. Super. 2017) (combining discussion of the children's needs and welfare pursuant to subsection (a)(8) and subsection (b) because the "third element of [s]ection 2511(a)(8) requires that the [o]rphans' [c]ourt conduct an analysis similar to that required under [s]ection 2511(b)").

- 18 -

> inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

Our analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of each child. *T.S.M.*, 71 A.3d at 267. "[T]he determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *Id.* (quotation marks omitted).

"[T]he parental bond is but one part of the overall subsection (b) analysis[.]" *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023). The needs and welfare analysis must also include the consideration of factors such as: "the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* (citations omitted). "These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs." *Id.* Importantly, "[orphans'] courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." *Id.*

Father argues that the evidence does not establish that termination of his parental rights best serves Children's needs and welfare. Father's Brief at 20-21. Father contends that he loves Children. *Id.* at 21. According to Father, his love for Children and his efforts at complying with his objections establishes reunification is in Children's best interests. *Id.*

Based on the record before us and the standard of review we must employ, we discern no abuse of discretion in the orphans' court's conclusion that Children will not be irreparably harmed by terminating Father's parental rights. Father's "own feelings of love and affection for [Children], alone, do[es] not prevent termination of parental rights." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). Indeed, the evidence of record established that none of Children's therapists recommended reunification with Father. Moreover, N.C.C., L.S.C, and I.A.C. all stated that they wished to be adopted. K.O.C., V.C.C., and H.S.C. are placed together and are doing well in their foster home. Furthermore, although Children are excited to see Father during visits, they usually focused on each other and their interactions with Father are limited. Finally, Father cannot provide stable housing or financially care for Children. Children are all in stable foster homes and are safe and happy. Accordingly, we conclude that the orphans' court did not err in determining that Children's developmental, emotional, and physical needs and welfare are best met by terminating Father's parental rights under the third prong of section 2511(a)(8) and 2511(b). *See In re I.E.P.*, 87 A.3d at 351-52 (noting that

where children reside in a stable, consistent, and loving home, and father failed to meet his objectives related to drug and alcohol treatment, housing, and employment, the termination of his parental rights were in children's best interests).

As the orphans' court's determination pursuant to section 2511(a)(8) and (b) is supported by the record, we must affirm the decrees terminating Father's parental rights to Children.  **See C.M.**, 255 A.3d at 358-59

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/29/2024