J-A34024-14
J-A34025-14
J-A34026-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.D. & | : | IN THE SUPERIOR COURT OF |
| A.D., MINORS | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.D. & P.D., | : | |
| MATERNAL GRANDPARENTS | : | No. 1124 MDA 2014 |

Appeal from the Order Entered June 20, 2014,
In the Court of Common Pleas of Cumberland County,
Juvenile Division, at Nos. CP-21-DP-0000122-2011
and CP-21-DP-0000124-2011.

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.D., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: J.D. & P.D., | : | |
| MATERNAL GRANDPARENTS | : | No. 1209 MDA 2014 |

Appeal from the Order Entered June 20, 2014,
In the Court of Common Pleas of Cumberland County,
Orphans' Court, at No. 5 Adoptions 2013.

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.D., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: J.D. & P.D., | : | |
| MATERNAL GRANDPARENTS | : | No. 1210 MDA 2014 |

Appeal from the Order Entered June 20, 2014,
In the Court of Common Pleas of Cumberland County,
Orphans' Court, at No. 6 Adoptions 2013.

J-A34024-14
J-A34025-14
J-A34026-14


IN THE INTEREST OF: J.D., A MINOR    :    IN THE SUPERIOR COURT OF
    :    PENNSYLVANIA
    :
APPEAL OF: K.D.    :    No. 1201 MDA 2014

Appeal from the Order Entered June 20, 2014,
In the Court of Common Pleas of Cumberland County,
Juvenile Division, at No. CP-21-DP-0000124-2011.


IN THE INTEREST OF: A.D., A MINOR    :    IN THE SUPERIOR COURT OF
    :    PENNSYLVANIA
    :
APPEAL OF: K.D.    :    No. 1202 MDA 2014

Appeal from the Order Entered June 20, 2014,
In the Court of Common Pleas of Cumberland County,
Juvenile Division, at No. CP-21-DP-0000122-2011.


IN RE: ADOPTION OF J.D., A MINOR    :    IN THE SUPERIOR COURT OF
    :    PENNSYLVANIA
    :
APPEAL OF: K.D.    :    No. 1211 MDA 2014


Appeal from the Order Entered June 20, 2014,
In the Court of Common Pleas of Cumberland County,
Orphans' Court, at No. 5 Adoptions 2013.


IN RE: ADOPTION OF A.D., A MINOR    :    IN THE SUPERIOR COURT OF
    :    PENNSYLVANIA
    :
APPEAL OF: K.D., MOTHER    :    No. 1212 MDA 2014


Appeal from the Order Entered June 20, 2014,
In the Court of Common Pleas of Cumberland County,
Orphans' Court, at No. 6 Adoptions 2013.

J-A34024-14
J-A34025-14
J-A34026-14


IN RE: ADOPTION OF J.D., A MINOR   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
APPEAL OF: J.O., BIOLOGICAL FATHER  :   No. 1213 MDA 2014

Appeal from the Order Entered June 20, 2014,
In the Court of Common Pleas of Cumberland County,
Orphans' Division, at No. 5 Adoptions 2013.


IN RE: ADOPTION OF A.D., A MINOR   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
APPEAL OF: J.O., BIOLOGICAL FATHER  :   No. 1214 MDA 2014

Appeal from the Order Entered June 20, 2014,
In the Court of Common Pleas of Cumberland County,
Orphans' Court, at No. 6 Adoptions 2013.


IN THE INTEREST OF J.D., A MINOR   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
APPEAL OF: J.O., BIOLOGICAL FATHER  :   No. 1219 MDA 2014

Appeal from the Order Entered June 20, 2014,
In the Court of Common Pleas of Cumberland County,
Juvenile Division, at No. CP-21-DP-000124-2011.


IN THE INTEREST OF A.D., A MINOR   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
APPEAL OF: J.O., BIOLOGICAL FATHER  :   No. 1220 MDA 2014

Appeal from the Order Entered June 20, 2014,
In the Court of Common Pleas of Cumberland County,
Juvenile Division, at No. CP-21-DP-000122-2011.


BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, J., and STABILE, J.

J-A34024-14
J-A34025-14
J-A34026-14

MEMORANDUM BY SHOGAN, J.:                    **FILED JANUARY 16, 2015**

We have consolidated these three appeals *sua sponte* for ease of disposition. This case began when Cumberland County Children and Youth Services ("CYS") filed a petition for a permanency goal change for A.D. and J.D. ("the Children") from reunification to adoption, and a petition for termination of the parental rights of K.D. ("Mother") and J.O. ("Father"). After multiple days of hearings, the trial court granted both petitions. J.D. and P.D. ("Grandparents"),[1] who were permitted to intervene as a kinship resource, appeal from the goal change order. Mother and Father appeal from both the goal change and termination orders.

The trial court provided a complete summary of the facts and procedural history in its August 20, 2014 opinion filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(a). Given that summary and the parties' familiarity with these matters, we will not repeat the facts and procedural history in this memorandum.

On appeal, Grandparents present the following issue for our review:

A. Whether the Trial Court erred in finding that it would be in the best interest of the children to place the children for adoption when kinship resources were available, specifically in this case with the maternal grandparents, who were willing, able, capable, bonded to and ready to adopt the children at issue and/or have the children placed with them.

---

[1]  J.D. is Mother's father, and P.D. is Mother's step-mother.

-4-

Grandparents' Brief at viii.

Mother raises the following issues in her appeal:

Did the Trial Court err as a matter of law and abuse its discretion in determining that Cumberland County Children and Youth Services ("CYS") presented evidence so clear, direct, weighty, and convincing as to enable the fact finder to come to a clear conviction without hesitancy, of the truth of the precise facts in issue?

Did the Trial Court err as a matter of law and abuse its discretion in determining the best interests of the children would be served by changing the permanency goal from reunification to adoption, when the evidence indicated that Mother could provide for the children's needs and appropriately parent the children?

Did the Trial Court err as a matter of law and abuse its discretion in determining the best interests of the children would be served by terminating the parental rights of Mother, when the evidence indicated that the original reasons for placement of the children no longer exist or had been substantially eliminated?

Did the Trial Court err as a matter of law and abuse its discretion in determining the best interests of the children would be served by changing the goal to adoption; terminating Mother's parental rights; and placing the children in separate foster care, when the evidence indicated that maternal grandparents, with whom the children have a significant bond, presented as an available resource to care for the children together?

Mother's Brief at 5–6.

Father submits the following issues for our consideration:

Did the Trial Court err as a matter of law and abused [sic] its discretion in changing the goal to adoption and terminating Appellant's parental rights because a parent's absence or failure to support his or her child due to incarceration is not, in itself, conclusively determinative of the issue of parental abandonment?

Did the Trial Court err as a matter of law and abuse its discretion in changing the goal for the subject children to adoption and terminating Appellant's parental rights because Appellant is able to provide the subject children with the essential parental care, control and subsistence in the very near future?

Did the Trial Court err as a matter of law and abuse its discretion in terminating Appellant's parental rights in that the conditions which led to the removal or placement of the children no longer existed or were substantially eliminated?

Did the Trial Court err in determining the best interest of the children would be served by terminating Appellant's parental rights?

Did the Trial Court err in determining the best interests of the children would be served by changing the goal for the subject children to adoption, terminating parental rights and placing the children in foster care, when maternal grandparents have a significant bond, have presented as a resource for the children and Father shall be an available resource in the near future?

Father's Brief at 5.

We employ an abuse-of-discretion standard when reviewing an order changing the placement of a dependent child. ***In re D.S.***, ____ A.3d ____, 2014 WL 5088795 (Pa. Super. filed October 10, 2014). Similarly:

appellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa.2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***In re R.I.S.***, 614 Pa. 275, 36 A.3d 567, 572 (Pa.2011) (plurality). As has

-6-

been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.* Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re I.E.P.*, 87 A.3d 340, 343–344 (Pa. Super. 2014) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012)).

The statutory requirements for a goal change are found in 42 Pa.C.S. § 6351. The trial court must consider the various factors listed therein with the best interest of the child in mind. *In re R.J.T.*, 9 A.3d at 1183–1184. The termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and

> convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

> *In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007) (citing 23 Pa.C.S.A. § 2511). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super.2009).

*In re I.E.P.*, 87 A.3d at 344.

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003). Additionally, this Court need only agree with the trial court's decision as to any one subsection in order to affirm the termination of parental rights. *In re I.E.P.*, 87 A.3d at 344.

Mindful of the foregoing law, we have reviewed the certified record, the parties' briefs, and the relevant law. We discern no abuse of discretion or error of law by the trial court. The Honorable Albert H. Masland conducted multiple hearings in 2013 and 2014 and received testimony over five days from therapists, bonding evaluators, outpatient and counseling supervisors, case workers, counsellors, adoptive parents, Mother, Father, and Grandparents. Judge Masland's well-written opinion to this Court comprehensively and accurately distills and disposes of the issues raised in these appeals. Trial Court Opinion, 8/20/14, at 1–37. We thus adopt the trial court opinion as our own and affirm on that basis. The parties shall attach a copy of the opinion in the event of future proceedings.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/16/2015

A340 EY 14

ADOPTION OF:

J.D., A MINOR
DOB: 01/25/2008

: IN THE COURT OF COMMON PLEAS OF
: CUMBERLAND COUNTY, PENNSYLVANIA
:
:
: No. 5 ADOPTIONS 2013

IN THE INTEREST OF:

J.D., A MINOR
DOB: 01/25/2008

: IN THE COURT OF COMMON PLEAS OF
: CUMBERLAND COUNTY, PENNSYLVANIA
:
:
: CP-21-DP-124-2011

-----------------------------------------------------------------

ADOPTION OF:

A.D., A MINOR
DOB: 11/11/2009

: IN THE COURT OF COMMON PLEAS OF
: CUMBERLAND COUNTY, PENNSYLVANIA
:
: No. 6 ADOPTIONS 2013

IN THE INTEREST OF:

A.D., A MINOR
DOB: 11/11/2009

:
:
: CP-21-DP-122-2011

**IN RE: OPINION PURSUANT TO PENNSYLVANIA RULE OF**

**APPELLATE PROCEDURE 1925**

Masland, J., August 19, 2014:--

I.    Overview

It has been said that detail is only given truth by the whole and the whole depends upon the detail. In this paradoxically simple yet complicated goal change/termination of parental rights case, we begin with the big picture.

K.D. ("Mother") has given birth to four children, all of whom were adjudicated dependent and removed from her care in November 2011. The middle two, J.D. and A.D. ("Children"), are the subjects of these proceedings. Their father is J.O. ("Father"). Mother's oldest child has been in the care of her

father since December 2011 and is the subject of dependency proceedings in York County. The youngest, formerly T.D., was part of the *initial* termination proceedings in April 2013. Mother voluntarily relinquished her rights to T.D. on June 20, 2013 and she was thereafter adopted by the first set of foster parents.

The 2013 termination proceedings were withdrawn in August after Father was released from prison and appeared to be a *bona fide* Plan B. Unfortunately, after only 6 months of contact with the Children, Father violated his probation and was returned to prison. Cumberland County Children and Youth Services ("CYS") turned to Mother as Plan C, but their efforts proved fruitless and by April 2014 termination proceedings were reinstituted.

By June 20, 2014, the final day of testimony in the *second* termination proceeding, the Children had been in the care and custody of CYS for approximately 31 months. During that time, Mother and Father failed to adequately address their goals despite the services and opportunities provided to them. The "conditions and causes" continue to exist. In many respects, nothing has changed.

But for the actions of CYS and the foster families, the Children would have completely languished. They are now in homes that offer them hope. The eleventh-hour intervention of Mother's father J.D. and step-mother P.D. ("Grandparents") did not present the court with a viable option to a goal change to adoption or termination. Ultimately, the idea that the Grandparents' bond, in particular, or "family," in general, can rescue the Children is chimerical. We do not minimize the bad choices Mother and Father have made that got them into

their current predicaments, but clearly, "family" never was the answer for them and is not the panacea for the Children.

There are a few healthy trees in the forest of facts presented to the court, not the least of which is the genuine love for the Children by all the parties. Despite that, the forest is in distress and the Children are threatened. In order for them to grow and develop in any fashion, the surrounding trees must be cleared. Sadly, the health of their respective trees requires that the Children live separately. This is a finding that no judge wishes to make, and we strived mightily against it in April 2013. What we reluctantly sensed then was made manifest in 2014 – the health and well-being of the children requires not only the termination of their parents' rights but also their adoption into separate families.

## II. Procedural Background

A hearing on the initial petitions of CYS to review and determine the permanency plans of the Children and to terminate the parental rights of Mother and Father was scheduled for March 8, 2013. It was continued at Father's request to accommodate his impending release from jail in Mississippi. Following a day of testimony on April 24, 2013, a second day of testimony was scheduled for June 20, 2013. On that date no testimony was received (save Mother's relinquishment of her rights to T.D.) and the matter was continued to afford the parents time to comply with their service plan goals. On August 16, 2013, largely on the basis of Father's nascent progress, CYS withdrew the petitions.

After it was clear that neither parent was able to meet their responsibilities, CYS filed new petitions to review and determine the permanency plans of the Children and to terminate their parental rights. On June 2, 4, and 20, 2014, we heard testimony on those petitions.[1] Following those hearings, the court granted the request for termination and, in the related dependency matters, changed the permanency goals for the Children from reunification to adoption.

Grandparents, Mother and Father (collectively "Appellants") filed timely notices of appeal and concise statements of matters complained of on appeal.

Mother raises the following points of error:

1. The Honorable Court erred as a matter of law and abused its discretion in changing the goal for this child to adoption and terminating Appellant's parental rights in that Appellant is able to provide the child with essential parental care, control, and subsistence.

2. The Honorable Court erred as a matter of law and abused its discretion in terminating Appellant's parental rights in that the conditions which led to the removal or placement of the child no longer existed or were substantially eliminated.

3. This Honorable Court was in error in determining the best interest of the child would be served by terminating Appellant's parental rights.

4. This Honorable Court was in error in determining the best interests of the child would be served by changing the goal for this child to adoption, terminating parental rights and having the child remain in foster care, when maternal grandparents, with whom the child has a

---

[1] Just as we scheduled matters around Father's release from jail in the initial proceedings, we scheduled around his re-incarceration in Mississippi for these proceedings. Although we were unable to connect on June 2 and 4, we were able to have a clear audio/visual connection with Father for the June 20 hearing.

significant bond, have presented as a resource for the child.

Father's points of error align with Mother's, with one significant addition:

1. The Honorable Court erred as a matter of law and abused its discretion in changing the goal to adoption and terminating Appellant's parental rights because a parent's absence or failure to support his or her child due to incarceration is not, in itself, conclusively determinative of the issue of parental abandonment. Incarceration alone is not an explicit basis upon which an involuntary termination may be ordered pursuant to § 2511 of the Pennsylvania Adoption Code, 23 Pa.C.S. § 2511. Courts must inquire whether the parent has utilized those resources at Appellant's command while in prison to continue and pursue a close relationship with the child or children. Appellant did desire to retain parental rights and exerted himself to take and maintain a place of importance in the child's life.

Finally, the following points of error were raised by Grandparents:

A. Specifically, the Court erred in finding that it would be in the best interest of the children to place them for adoption, when kinship resources were available, specifically in this case with the maternal grandparents.

B. Moreover, the Court erred in that it was against the weight of the evidence to allow the goal for the children at issue to be changed to adoption, thereby only allowing both sets of separate foster parents to adopt the children at issue, when kinship resources, specifically, in this case, the maternal grandparents were willing, able, capable, and ready to adopt the children at issue and/or have these children place [sic] with them.

For ease of review, this opinion will address the following questions, which, we submit, distill fairly Appellants' concerns and the requirements of the law regarding the goal change to adoption and the termination of parental rights:

-5-

1. What conditions led to the removal of the Children and do they still exist?
2. Are the best interests of the children served by a goal change to adoption as opposed to placement with Grandparents?
3. Is there clear and convincing evidence that necessitates the termination of parental rights?
4. Are the familial bonds capable of meeting the developmental, physical and emotional needs and welfare of the Children?

### III. Legal Standards

Although the court followed the best practice of hearing evidence on the goal change and the termination of parental rights at the same hearing, we recognize our obligation to make discrete findings on these issues.

#### A. Goal Change

The statutory requirements for a goal change are found in 42 Pa.C.S. § 6351, wherein numerous factors are set forth for trial courts to consider. Because the Superior Court is eminently familiar with these factors, we set forth only § 6351 (f)(9), which is particularly significant in this case:

> Matters to be determined at permanency hearing.—At each permanency hearing, a court shall determine . . .
> (9) *If the child has been in placement for at least 15 of the last 22 months* or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continued to be made, *whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child.* . . .

42 Pa.C.S. § 6351(f)(9) (emphasis added and inapplicable language omitted).

In making a goal change to adoption the court focuses on the best interests of the child and, with the benefit of the full history and record, must decide if a child can be safely reunited in a reasonable period of time *and* if that reunification best serves the needs and welfare of the child. Alteration of a child's permanency goal is reviewed on appeal to determine if the "court's judgment was manifestly unreasonable ... did not apply the law, or ... was a result of partiality, prejudice, bias or ill-will as shown by the record." *In re R.M.G.*, 997 A.2d 339, 345 (Pa. Super. 2010).

### B. Termination of Parental Rights

In the related but distinct inquiry of the termination of parental rights, the party seeking termination bears the burden of establishing by clear and convincing evidence that the grounds exist. *Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994). Parental rights may be determined on several grounds, including:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ...
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions

which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511.

The clear and convincing standard, "requires evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re K.T.E.L.*, 983 A.2d 745, 750 (Pa. Super. 2009). Appellate courts must simply determine "whether the decision of the trial court is supported by competent evidence." *See In re Adoption of R.J.S.*, 901 A.2d 502, 506 (Pa. Super. 2006).

## IV. Discussion

At the outset, we refer the Superior Court to our statement at the close of the hearings wherein we summarized the basis for granting the goal change to adoption and for our termination order.[2] Given the lengthy hearing and late hour,

---

[2] Transcript of Proceedings, June 20, 2014 at 206-11 (hereafter N.T. June 20, 2014 at ___). Our concept of brevity may appear as verbosity to this Honorable Court. For that, we apologize sincerely. However, we take seriously and proceed charily with TPRs. More than in any other matter that comes before us, we take the initiative to complete the record. Indeed, from the first hearing on April 24, 2013 through the last on June 20, 2014, following the examination by counsel, we clarified, probed, quizzed and challenged nearly every witness—taking nothing at face value. Because we trust this Honorable Court will be equally circumspect, this opinion errs inexorably on the side of verbosity.

-8-

we spared everyone the full load at that time. However, those findings will not suffice for the Superior Court's review. Therefore, we offer the following.

### A. *The Conditions Leading to Placement*

The circumstances under which CYS first became aware of Mother and the Children are set forth at length in the Pre-Hearing Memorandum and Pre-Dispositional Statement dated November 10, 2011. To summarize, this saga began in March 2010 when a referral was received by CYS following Mother's presentation to an emergency room where she was diagnosed with pelvic inflammatory disease and prescribed narcotics. At that time, Mother "broke down and expressed severe postpartum depression" but did not meet the criteria for a 302 commitment. As a result, the case was opened for in-home services. It was closed on September 19, 2011 after Mother successfully complied with drug and alcohol counseling, received Suboxone therapy and continued in her mental health counseling and medication management.

In October 2011, a confidential referral was received regarding Mother being intoxicated in the referral source's office. Multiple attempts were made to drug test Mother. Finally, on November 9, 2011, CYS received the results of a drug test from October 28. Among other controlled substances in her system, there were extremely high levels of morphine, which Mother admitted to purchasing on the street because of post-operative pain. Also during this time frame, the agency had received referrals regarding the Children being left alone in a car and detailing aggressive behavior by J.D. towards the infant T.D.

-9-

The memorandum's sole note about Father was that CYS did not have an address for him and that a bench warrant had been issued for his arrest on September 8, 2011 regarding pending burglary charges. Father may not have directly caused their dependency, but his absence was a contributing factor in keeping them there.

On November 21, 2011, pursuant to the Master's Recommendation for Adjudication and Disposition, we found all four of Mother's children to be dependent. In finding that the Children lacked proper care and control, Mother's substance abuse, mental health concerns, parenting deficits and finances all conspired to remove the Children from her care. The CYS caseworker, Virginia Koser, testified credibly and at great length throughout these proceedings regarding the conditions leading to placement and Mother's inability to address those concerns, which we highlight below.

### 1. Mother's Drug and Alcohol Problems

The first goal in Mother's family service plan is to be drug and alcohol free. The record is replete with testimony from numerous witnesses regarding the history of Mother's substance use disorder, which Ms. Koser summarized well at the April 2013 hearing:[3]

- Mother received intensive out-patient ("IOP") drug and alcohol counseling in April 2010, November 2010, December 2011 and in January or February 2012. She was unsuccessfully discharged from at least three of those counseling sessions.

---

[3] Transcript of Proceedings, April 24, 2013 at 41-44 and 67-68 (hereafter N.T. April 24, 2013 at ___)

- Mother received in-patient drug and alcohol treatment from December 28, 2011 through January 7, 2012 when she was discharged against medical advice. On January 12, 2012 Mother overdosed on clozapine and rum.

- Mother again received in-patient treatment from April 26, 2012 through May 23, 2012. Although discharged successfully, she did not do well in this program and was recommended for intensive outpatient.

- Mother was involved in Suboxone treatment between February and August 2011 and again beginning on June 13, 2012, following her last in-patient stay.

- On July 11, 2012 Mother was released from prison, with directions to enroll in an inpatient facility in 14 days. Before she could do that she overdosed on prescription drugs on July 12 and, as a result, was in prison from July 13 through the hearing on April 24, 2013.

- During her imprisonment leading up to the April hearing, Mother participated in IOP services.

These examples indicate not only the behavior that necessitated placement, but also that the conditions had not changed. Regarding Mother's lack of progress since April 2013, we note the following from the testimony of Kay Foultz-Brown, program supervisor at Gaudenzia West Shore Outpatient:[4]

- Mother began IOP on July 25, 2013 and completed four months later on November 29, 2013 – longer than the 8 weeks it should take, but not "well outside the norm."[5]

- After completing IOP, Mother transitioned to outpatient ("OP"). She began well, but with numerous cancellations and no-shows,

---

[4] Transcript of Proceedings, June 2, 2014 at 21-31 (hereafter N.T. June 2, 2014 at _); and N.T. June 20, 2014 at 7-9.
[5] At the time of the August 16, 2013 hearing, Mother had missed three appointments and was on the verge of being discharged. See N.T. August 16, 2013 at 4-5.

-11-

she was still in OP at the June 2014 hearings. In May 2014 alone out of nine possible appointments, she cancelled two and no showed for four. Mother thought she was being discharged in May but that only accounts for one missed meeting.

- Mother was advised by Ms. Foultz-Brown on June 2 that she needed 6-8 weeks of continued OP before she would be discharged.
- After Mother was placed on an attendance behavior contract on June 2, she no-showed at the first meeting on June 11, but attended a group meeting on June 14.
- Mother's prognosis is "fair."[6]

Based on our review of the full record and our familiarity with drug and alcohol treatment through our service as Treatment Court judge for 4½ years, Ms. Foultz-Brown was kind in her prognosis. As she acknowledged in explaining Mother's extended periods in IOP and OP counseling, "addiction is not something that can be cookie-cuttered into a certain amount of months."[7] This is true; however, Mother has spent years, literally, in counseling with little more than half-baked success. Her lack of commitment to counseling is also evidenced by her failure to comply with testing. Although CYS deemed her drug testing from May 2013 to February 2014 to be "compliant," we are less forgiving with respect to Mother's failure to report for tests when they "didn't line up with her schedule."[8]

---

[6] We refer the Superior Court to CYS Exhibit 12, pp. 3-4, the update on February 7, 2014, from Mother's counselor Christine Major, for a clearer look at Mother's lack of progress, which includes the following "The prognosis is fair at best considering her vagueness related to honestly disclosing information ..., her unwillingness to honor the attendance contract, her failure to disclose her employment status, and her superficial interaction in the group setting."
[7] N.T. June 2, 2014 at 25.
[8] N.T. June 2, 2014 at 68-69.

To the extent Mother was compliant with testing, her behavior returned to square one in the spring of 2014, with an excuse on April 25 followed by a no-show on April 28.[9] Thereafter, any semblance of compliance vanished, as she rebuffed all five attempts to test her between May 25 and June 17. Mother may claim that she saw no reason to cooperate with CYS after the petitions were filed, but that does not explain her failure to show up for half of the tests required by her probation officer between November 2013 and June 2014.[10] All of this adds up to more than non-compliance – it is outright defiance.

Finally, Mother's drug seeking behaviors and abuse of pain medication, first exhibited in 2010, are unabated. Regarding the procurement of pain medication, the testimony revealed that after allegedly hurting her back, Mother went to three emergency rooms and was able to obtain a prescription for Hydrocodone.[11] She was advised by Ms. Koser not to take this highly addictive opioid, which concerned Ms. Foultz-Brown as well. Of course, she took it. Perhaps even more alarming, Mother advised the staff at Alternative Behavior Consulting (ABC) during a visit with the Children on May 22, 2014, that she needs to take more than what is prescribed for them to work.[12]

The tale of the altered Valium prescription was related by several witnesses.[13] In short, on March 25, 2013 Mother was given a prescription for Valium by Dr. Maurice Picciotto, with an admonition "NOT TO Fill until 4/1/14" in

---

[9] N.T. June 2, 2014 at 69
[10] N.T. June 20, 2014 at 12 and 15.
[11] N.T. June 2, 2014 at 27 and 30-31 (Kay Foultz-Brown), 70 and 90 (Virginia Koser)
[12] N.T. June 2, 2014 at 51-52.
[13] N.T. June 2, 2014 at 8 (Jill Davis), 27 (Kay Foultz-Brown), 70 (Virginia Koser), and 134-135 (Mother's response to the Court's questions); *See also* CYS Exhibit 10, pp. 4-6, from June 2, 2014.

the middle of the script. On that very date, Mother or her "friend" attempted to fill the prescription with the date altered to "2/1/14." Obviously, any pharmacist worth his or her salt would realize that no physician would write a script in March with an admonition not to fill it in February. Mother's testimony on the whole was rambling, defensive and confusing. However, on this point, her deceptive twists were nothing short of outright lies. Having received the script on March 25th, she knew it could not be filled on that date and had no reason to give it to a "friend" to have it filled.

Despite Mother's protests that she never abused Vicodin we were neither comforted nor convinced that "it was always Percocet or Morphine."[14] Further, when she purportedly disclosed to the ER doctor that she had an addiction "three years ago," she overlooked what was painfully obvious to the court – her "friend" is her addiction and he has not left her side in the past 3 years.

### 2. Mother's Mental Health

Mother's next goal was to improve her mental health functioning. At the April 24, 2013 hearing, Ms. Koser noted Mother had been diagnosed with bipolar disorder, but was being treated for depression and mood swings in prison.[15] Significantly she was to get a new psychiatric evaluation upon her release from prison. She had difficulty obtaining treatment after her release. Eventually, she received counseling from NHS-The Stevens Center ("Stevens") that lasted from January 2, 2014 to April 24, 2014. Having just discussed the altered Valium script, we note that it resulted in her termination from Stevens and her eventual

---

[14] N.T. June 20, 2014 at 107.
[15] N.T. April 24, 2013 at 46.

"transfer" to Laurel Life. CYS Exhibit 10 from June 2 reveals her sporadic attendance at Stevens, and indeed, with previous providers as well. And, as noted in CYS Exhibit. 2, from June 20, Mother has fared no better with her attendance at Laurel Life. In sum, as with her drug and alcohol counseling, Mother's inconsistency has precluded her from attaining this goal.

### 3. *Mother's Parenting Skills*

We found the testimony of Debbie Bush, parent educator for ABC, to be compelling and encourage the Superior Court to examine it thoroughly.[16] We will share the salient points regarding Mother's failure to meet her goals.

Prior to an adjudication of dependency, Mother was referred to ABC for Training for Improved Parenting Skills ("TIPS"). The ten sessions occurred between October 2010 and January 2011. Mother's second round of TIPS occurred after her release from prison in 2013. Unfortunately, her inability to demonstrate a commitment to completing drug and alcohol counseling delayed the start of services with ABC. Thus, between September 26 and November 7 she received TIPS training. Mother then received 36 Skills Application Sessions ("Skills") between November 21, 2013 and March 22, 2014.

Mother's objectives and her performance in Skills are detailed in CYS Exhibit 9 and in Ms. Bush's testimony. Suffice it to say, she did not meet her objectives. For example, instead of providing time for the Children and reestablishing a bond, she was consistently distracted by phone calls and texts and ignored prompts to turn the phone off.[17] This behavior is aggravating in

---

[16] N.T. June 2, 2014 at 39-66. *See also* CYS Exhibit 9, June 2, 2014.
[17] N.T. June 2, 2014 at 42.

-15-

society at large, but it is inexcusable and inexplicable when engaged in by a mother whose parental rights are at risk.

Mother's communication with her children was inconsistent and often not age appropriate.[18] Alarming in light of Mother's own penchant for deception, she told her 5-year-old daughter J.D. to keep a secret about a breach by Mother of ABC's expectations.[19] Regarding ABC's goal of financial stability, at best, she had an "artificial sense of stability," relying on a friend to pay her rent and other bills. By March 2014, after losing her job and contact with her friend, she had no idea how she would pay her rent or bills.[20] Ultimately, Ms. Bush noted Mother was unable to assume, let alone resume, a parental role.[21]

On the heels of her financial distress, services ended on March 22, 2014, when Mother informed Ms. Bush that her car had been repossessed, "that she was very overwhelmed, needed to take a break and was going out of town."[22] At this point Mother claims that Ms. Bush told her to do whatever she had to in order to get a car. Having already noted that Mother was not a credible witness, we find her claim to be deceptive at best. Overwhelmed people tend to hear what they want to hear – this may be particularly true with addicts.

When we asked what ABC would require if the court asked them to resume services, Ms. Bush was hesitant – "we tried back in 2010 to have [Mother] be successful at this ... We started back in 2013. Again, my biggest

---

[18] N.T. June 2, 2014 at 44-45.
[19] N.T. June 2, 2014 at 44-45
[20] N.T. June 2, 2014 at 43-44.
[21] N.T. June 2, 2014 at 45.
[22] N.T. June 2, 2014 at 49.

concern is the length of placement, the time the children have been in placement."[23] We agree. At this point, another round of Skills is pointless.

Somehow, Mother contends that she met her service goals and that the conditions no longer exist. To bolster this, she points to the efforts of CYS to make things work for Mother after Father's re-incarceration in late 2013, and she and her counsel almost rhetorically repeated, "What has changed?" However, when counsel asked this of Ms. Bush, she responded, "Her critical thinking skills and ability to solve problems is definitely a deficit and has been. I mean, she has never really made that much progress in ultimate goals."[24] Ms. Bush concluded her report as follows:

> Since that increase in responsibility [in February 2014], [Mother] has decompensated in her emotional and environmental stability. She lost her job, her car was repossessed, her benefactor for rent disappeared and on March 22nd 2014 [Mother] contacted me to state she needed a break and was leaving town.
> Since there has been no contact from [Mother] since that date, ABC has closed this case and has recommended no further parenting sessions.[25]

Indeed, when CYS was trying to avoid filing a second set of termination petitions, Ms. Bush and ABC were reluctant to come on board.[26] Perhaps, CYS and the court wanted reunification more than the parents did? ABC was able to make a more objective assessment. Ultimately, Mother's script forgery and escape to Mississippi were mere confirmations that the efforts of CYS, ABC,

---

[23] N.T. June 2, 2014 at 63-64.
[24] N.T. June 2, 2014 at 59.
[25] CYS Exhibit 9, June 2, 2014 at 3.
[26] N.T. June 2, 2014 at 52-53.

-17-

Gaudenzia, etc. were for naught. The only thing that changed was that CYS had come to the painful acceptance that Mother would not and could not change.

### 4. Mother's Ability to Cooperate and Follow the Rules

We submit that Mother's failure to come close to meeting her goals with respect to the three foregoing areas more than suffice to grant a goal change without addressing her deficits in the other areas. Nevertheless, we cobble the balance of her service plan requirements under this heading.

Mother's actions over time have shown her general disdain for authority, but her well-honed deception and excuses can make this difficult to discern. She provided a glimpse of her true essence during questioning on her ability to meet the goal of financial responsibility.[27] When pressed on the extra income she was allegedly earning from cleaning homes and why she did not tell CYS, Mother's response was:

> [Ms. Koser] never asked, and to be honest, I've learned through past experience not to volunteer anything unless I am asked, because it will be turned around.[28]

Ironically, Mother used her deceptive nature as a defense to the fabricated deception of her self-employment. Plus, this deception occurred when CYS was bending over backwards to help her *before* she went to Mississippi. The fact is that Mother was attempting to deceive CYS, ABC, Gaudenzia and anyone who did or did not ask about her income.

---

[27] N.T. June 2, 2014 at 111-22. When we indicated to counsel for CYS that we had heard enough cross on Mother's finances, we did not say that we found Mother's testimony to be fanciful about her ability to provide for her Children. In fact, it was so incredible that we spare the Court a full recitation herein.
[28] N.T. June 2, 2014 at 113.

Mother's deception was, perhaps, most apparent in her explanation of the trip to Mississippi to get a car. At first she said the length of this trip was only 2 to 2½ weeks.[29] However, when pressed by the GAL on the drug tests she missed with probation, she explained that by saying the trip lasted 1 to 1½ months.[30] Our assessment of the trip is simple – when life became overwhelming (once again), and her means of support dwindled, Mother attempted to load up on Valium and take a break with her relatives in Mississippi.[31] After this self-approved respite, she headed north expecting no one, including her Children, to think twice about her spring break. The following exchange on her license is illustrative:

> Court: You don't have a driver's license now, correct?
> Mother: As far as I know I don't.
> Court: And when was the last time you had one?
> Mother: It was before I went to prison, because I surrendered it. But I do have my vehicle back, and right now it is in the name of a friend of mine.
> Court: So you drove that vehicle back from Mississippi?
> Mother: Yes.
> Court: Okay.
> Mother: Yeah, tell me about it, yeah.
> Court: No, you tell me about it. That's the way this works.
> Mother: I should have been safer, but to be honest with you, when I say that Debbie Bush perjurized herself, she did. Because she told me no matter what –
> Court: Do you remember her testimony a few weeks ago where she said she did not tell you to do whatever you could?

---

[29] N.T. June 20, 2014 at 100.
[30] N.T. June 20, 2014 at 131. *See also* her exchange with the court at 136.
[31] Maternal Grandmother was presented as a resource by Mother in 2013; however maternal Grandmother has a checkered past with alcohol and opiates as well. *See* N.T. April 24, 2013, at 60-64.

Mother: And I am swearing on oath, swearing on everything God above, she told me to do whatever necessary. She knew I was going to Mississippi to get a vehicle.[32]

When a witness insists she is going to be honest or swears to the Almighty, we brace ourselves for a lie. Mother attempted to deflect our inquiry by shifting the subject and essentially blaming Ms. Bush for making her drive illegally from Mississippi. Of the two, only Ms. Bush is credible.

We conclude this section with a glimpse at Mother's incarceration, which in the grand scheme of things, is a symptom rather than a disease. On April 24, 2013, Ms. Koser laid out the various offenses that resulted in Mother's incarceration during that hearing.[33] On June 2 and 20, the court was updated generally by her probation officers, apprised of new charges filed on May 28, 2014 (Driving under Suspension/DUI related), and informed of a revocation on June 17 on a retail theft offense.[34] Of course, Mother blames CYS and her probation officer for her woes, noting "I can't explain anything to her. She thinks I am a liar. Now, all of a sudden, after a year of being my Probation Officer, I am a liar."[35] No, Mother has been dishonest for a long time, but she is only deceiving herself. Until she is honest with herself, she will struggle to abide by *any* rules.

---

[32] N.T. June 20, 2014 at 135-136.
[33] N.T. April 24, 2013 at 47-49.
[34] N.T. June 2, 2014 at 11-16; June 20, 2014, at 11-18. Regarding the revocation, by order of court dated August 11, 2014, Judge Thomas A. Placey committed Mother to the Department of Corrections for a State Intermediate Punishment assessment. Judge Placey's order also noted that Mother will be arraigned via video (from SCI-Muncy, we presume) on September 18, 2014 on new charges. CPCMS reveals those charges to be felony Retail Theft and Public Drunkenness, having occurred on July 3, 2014, *See* CP-21-CR-0002265-2014. Had we needed these updates to make our decision, we would have continued the hearings. As it is, they are insignificant for the court's assessment of the case; however, they may be highly relevant for Mother's long-term health and battle with her addictions. May SIP succeed where we failed.
[35] N.T. June 20, 2014 at 131.

### 5. Father's Service Plan Goals

Father's incarceration did not lead directly to placement in 2011, but his short-lived reappearance and failure to meet the Children's needs were factual and concurring causes in our determination that the conditions necessitating placement remain unrelieved. Unlike with Mother, we do not have the volume of evidence on each item in Father's goals. Therefore, our review will be more chronological following a summary of his criminal record.

Father has convictions in Mississippi, Pennsylvania, Alabama, and Florida that include burglary, fraud, forgery, larceny, theft, assault, trespass, flight and a weapons offense.[36] For our timeline, Father was incarcerated in Mississippi from the declaration of dependency to March 3, 2013, and then spent a month in Cumberland County Prison ("CCP").[37] Consequently, Ms. Koser's discussion of his "progress" on April 24, 2013, was somewhat speculative.

What gave the court hope was the discussion of Father's contact with CYS since December 2011 and the consequent case planning that began.[38] To be sure, Father did his best to stay in touch with CYS and always expressed concern for the Children. Thus, his early compliance with drug and alcohol testing[39] and quick completion of a parenting evaluation with ABC,[40] created some optimism. However, in the realm of parenting, Father had quite a ways to go. Prior to his incarceration in Mississippi in November 2011, he was merely "around the children, maybe even babysitting them," and shortly after confirming

---

[36] N.T. April 24, 2014 at 50-53
[37] N.T. April 24, 2014 at 50.
[38] N.T. April 24, 2014 at 54-55
[39] N.T. April 24, 2014 at 50.
[40] N.T. April 24, 2014 at 76.

he was their father in September 2011, he left Mother and the Children and returned to Mississippi.[41] As such, his visit with the Children on April 22, 2013, constituted his first contact in 19 months. Fortunately, the visit went well and J.D. said she remembered Father.

With this toehold on reunification and some baby steps over the next month, the matter was continued to August 16, 2013. At that time, the update from Ms. Koser was encouraging, but far from conclusive.[42] Although Father's drug tests were negative, his work schedule made them anything but random. There were communication problems with his probation officer, but they appeared to be resolved. Most importantly, Father was doing well with the Skills program and ready for reunification services. Ms. Koser was planning to do a safety check of his apartment and transition him to supervised in-home visits and thereafter to unsupervised and eventually overnight visits.

Ms. Koser raised yellow flags in August with respect to the Children. A.D.'s behaviors had regressed significantly and CYS planned to move them to a new foster home, where they had spent two weeks of respite time that summer.[43] Moreover, both children had not only expressed a desire *not* to live with Father, but had also "made some pretty concerning statements about [Father] in particular that the agency [didn't] want to brush [aside] and move them with dad today."[44] Although we did not probe this point (out of fear that our plans for

---

[41] N.T. April 24, 2014 at 56-57
[42] N.T. August 16, 2013 at 7-10.
[43] N.T. August 16, 2013 at 11.
[44] N.T. August 16, 2013 at 11-12.

Father would fail), the details of these concerns were rendered inconsequential by Father's subsequent actions.

By June 20, 2014, Father's flags were predominately red. On the positive side Debbie Bush of ABC noted he was doing well with services, but he ended the Skills sessions abruptly on October 15, 2013, with a text to Ms. Bush that he "could no longer proceed with the sessions."[45] From Ms. Bush's perspective, Father was progressing well and developing a bonding during his unsupervised time, but Ms. Bush was not ready to recommend reunification.[46]

Of course, the reason for Father's text message was that he had tested positive for opiates (Vicodin) on October 4 and had a revocation hearing scheduled for October 22, 2013, at which he failed to appear, resulting in a bench warrant for his arrest.[47] Father's explanation for failing to appear for the hearing was flimsy at best – "we had a mess up with our mailboxes there in Enola, and I didn't get that until it was like the day before. And, stupidly, I did not call to reschedule ..."[48] Eventually, Father was picked up on the warrant in Dauphin County, served some time there for some charges "from way, way back" and returned to Cumberland County shortly before his revocation hearing on January 7, 2014.[49] At that hearing, based on a Prior Record Score of 2 at the time of this 2009 burglary, Father received a sentence of 6-23 months.[50] After serving this sentence, Father floated between the Dauphin and Lebanon County prisons (on other matters from way, way back), before being transported to

[45] N.T. June 20, 2014 at 22-25.
[46] N.T. June 20, 2014 at 28-29.
[47] N.T. June 20, 2014 at 32.
[48] N.T. June 20, 2014 at 148.
[49] N.T. June 20, 2014 at 148
[50] N.T. June 20, 2014 at 33.

Lamar County, Mississippi, where he received an additional 12 month parole revocation on June 9, 2014.[51]

Even if we accept the worn-out excuse of blaming the post office, Father got the notice the day before the hearing and simply ignored it. He had no intention of voluntarily appearing in Cumberland, Dauphin, Lebanon or Lamar. In short, Father failed to provide parental care by taking actions that led him back to prison. If the Children were a priority, Father would have done everything necessary to straighten things out with his probation officer so that he could continue to see his kids. Instead, realizing he had screwed up, his priority was to enjoy a few more weeks on the street before heading back to jail. Thus, he could "no longer proceed with the sessions." And, we will no longer proceed with our assessment of Father's "progress."

In sum, other than accepting that Father loves his Children, his testimony was only slightly more credible than Mother's. Based on the foregoing, we turn to the essential questions in changing the goal to adoption.

### B. The Need for a Goal Change

#### 1. Is reunification viable or imminent?

With respect to Mother, we were prepared to terminate her rights in April 2013. Having granted her a reprieve, had all the stars aligned thereafter, Mother's reunification with Children would be arguably imminent. Unfortunately, reunification was not and is not viable. Mother's penchant for deception, lack of commitment to any type of counseling and her unwillingness to follow anyone's rules, renders her success implausible.

---

[51] N.T. June 20, 2014 at 45; CYS Exhibit 1, June 20, 2014.

Regarding Father, even if we still believed reunification was viable (and the hope we had on August 16, 2013 no longer exits), it is clearly not imminent. If Father is released from prison in the near future, it would take months to get back to the point he was at last September, which was nowhere near reunification. Only Pollyanna would provide Father with unsupervised visits in under 12 months. Waiting once again for Father would extend the Children's prospect for permanency to a deplorable 4 years.

### 2. *Have the parents remedied the conditions that led to removal?*

Nothing has changed with respect to the parents' abilities to care for their children. Ironically, it was the parallel planning that CYS appropriately used which allowed them to push the rope as far as they could with Mother after Father went back to jail. And, having found those efforts to be in vain, CYS could quickly change tack and move to terminate based on our full analysis – the answer to this question is a resounding "NO!"

### 3. *Does reunification serve the needs and welfare of the Children?*

On April 24, 2013, the court heard testimony regarding the unsavory prospect of separating five-year-old J.D. from her younger siblings. First, Dr. David Lillenstein, who conducted a bonding evaluation, cautioned that keeping the Children together could result in J.D.'s "reactive behaviors" causing problems for A.D. and T.D. (who was with them at that time).[52] At that time, the Children were not interacting well together and D.C.D. and S.D. ("Foster Parents 1") had determined that they could no longer consider adopting all three, with J.D.

---

[52] N.T. April 24, 2013 at 10.

-25-

potentially moving to another home.[53] The doctor acknowledged the concerns of the GAL and the court that separating J.D. might be good for the younger siblings but could be detrimental to her.[54]

The therapist for the Children, Becky Allen-Mitchell, described J.D.'s troublesome behaviors in July 2012, which included being demanding, attention seeking, very materialistic, lacking attachment and boundaries, and being aggressive towards herself, including scratching open her face.[55] A.D. also exhibited troubling behaviors, including playing with his feces, ripping his clothes and being destructive with toys.[56] Still, Ms. Allen-Mitchell was "not sure I'm an advocate for [separating the Children] because of the potentially "detrimental" and "grave" effects on J.D., whom she diagnosed as having reactive attachment disorder ("RAD").[57]

Regarding the relationship with one another, Ms. Allen-Mitchell noted that, in part because of J.D.'s diagnosis, the Children did not react well together and A.D. was not connected at all to J.D.[58] Likewise, J.D. was very dismissive of A.D. and referred to him as "that" or "that boy."[59]

Ms. Allen-Mitchell noted that although J.D. did not mind visits with Mother, "by no means does she want to live with her. She has made that clear."[60] A.D. would become upset and act out when talking about Mother, and deny that she

---

[53] N.T. April 24, 2013 at 11-12.
[54] N.T. April 24, 2013 at 15-19.
[55] N.T. April 24, 2013 at 22-23.
[56] N.T. April 24, 2013 at 23-24.
[57] N.T. April 24, 2013 at 25-26.
[58] N.T. April 24, 2013 at 26-27.
[59] N.T. April 24, 2013 at 37.
[60] N.T. April 24, 2013 at 29.

was his mother.[61] In fact, Ms. Allen-Mitchell advocated discontinuing the prison visits with Mother because they caused A.D.'s behavior to disintegrate.[62]

Also on April 24, 2013, D.C.D., the initial foster father (and now adoptive father of T.D.), related his concerns with the interaction of the Children. He was concerned with J.D.'s disruptive, attention-seeking behaviors and their impact on the younger two siblings, noting in particular that she feels no remorse after acting out.[63] The court questioned D.C.D. extensively on the prospect of separating the three children, with the hope that J.D. might get another chance.[64]

Our efforts did not bear fruit, but our obvious reticence to separate the Children may have impacted the decision of CYS in June 2013 to move forward with Plan B, *i.e.* Father getting his act together. Thus, on August 16, 2013, at the hearing that culminated with the withdrawal of the termination petitions, the update on the Children was still mixed – on the down-side, A.D. was becoming more problematic, but on the plus-side, a new specialized therapist had become involved and a new foster family was waiting in the wings.

By the time of the hearings in June 2014, primarily because of problems with A.D., the Children had undergone a trial separation in November 2013.[65] The separation was made long-term in December, at which time A.D. was placed with the current foster family and pre-adoptive home of J.P. and J.P. ("FP-A").[66] J.D. was able to stay with the same family and finish kindergarten without

---

[61] N.T. April 24, 2013 at 61

[62] N.T. April 24, 2013 at 30.

[63] N.T. April 24, 2013 at 116-118.

[64] N.T. April 24, 2013 at 122-127.

[65] N.T. June 20, 2014 at 49-51.

[66] N.T. June 20, 2014 at 49-51

disruption.[67] Thereafter, she was moved to a new foster home and *prospective* pre-adoptive home of T.W. and H.W. ("FP-J").

The separation of the Children was recommended by the Children's therapist, Jill Parisi, in part, because of the intense hatred between them.[68] In noting that the Children had stabilized, Ms. Koser emphasized that CYS was not "happy by any means that they are separated, but it is nice to see that they are doing well where they are and seem to benefit from not living together."[69]

Ms. Parisi filled in the details on June 2, 2013. In the preceding three months, A.D.'s behaviors had greatly improved and he was showing a definite attachment to FP-A.[70] After providing background that fully supported her conclusion, she recommended that A.D. stay in the current placement, noting that "since [A.D.] has been with [FP-A], he has almost been a different kid. He listens. He has manners. He's polite. He's cooperative. He's not as hyperactive and he seems – is much more happier [sic] than he was."[71] Having questioned J.P., the foster father, extensively, we are likewise satisfied that this placement is the best opportunity for permanency that A.D. has ever had.

Regarding J.D., Ms. Parisi noted that she was doing fairly well, but had some regression in the last two months.[72] In fact, both foster families and Ms. Parisi noted some regression for the Children following visits with Mother, which is attributable both to their responses to Mother and to each other.[73] Although

---

[67] N.T. June 20, 2014 at 52.
[68] N.T. June 20, 2014 at 52.
[69] N.T. June 20, 2014 at 52.
[70] N.T. June 2, 2014 at 107.
[71] N.T. June 2, 2014 at 114
[72] N.T. June 2, 2014 at 112.
[73] N.T. June 2, 2014 at 107-111.

J.D. expressed some preference for the Grandparents (because they are "family"), Ms. Parisi recommended that she live with FP-J because they offer a loving, stable home and are willing to adopt her.[74]

In further support of a goal change to adoption, when Ms. Koser expressed her pleasure that J.D. seemed to like FP-J after only two weeks; J.D. replied, "I don't just like it here, I love it here."[75] Of course, the court does not base a goal-change decision on the statements of a six-year-old, no matter the context. But we note her remarks because they are consistent with those of T.W., the foster father. His testimony as a whole and his responses to the court in particular, impress us that he and his wife are not only aware of the challenges ahead but are capable of meeting them.

We are satisfied that reunification will not meet the needs of the Children and turn to the final issue regarding the goal change.

### 4. Is adoption the appropriate goal as opposed to placement with fit and willing relatives?

Although we permitted Grandparents to intervene in the adoption case but not the goal change, practically, they engaged as fully as any other party in the joint proceedings and have appealed at both the dependency and orphan's court dockets. Of course, in a goal change the court must consider the options available under 42 Pa.C.S. § 6351(f.1). And in changing the goal to adoption, we considered whether the Grandparents are either fit and willing relatives such that the court should not change the goal to adoption or a pre-adoptive resource.

---

[74] N.T. June 2, 2014 at 117.
[75] N.T. June 20, 2014 at 55.

-29-

Therefore, we leave the procedural technicalities up to the Superior Court, and proceed with our analysis.

Ultimately the question is whether the Grandparents' bond is such that the best interests of the Children compel us to ignore the preference for adoption of the Juvenile Act and the federal Adoption and Safe Families Act and place the Children with the Grandparents. Factually, they have had a role in the lives of the Children, but it has not always been positive. On December 12, 2011, one month after the declaration of dependency, the Children were placed with Grandparents as an informal kinship home, where they remained until they were removed on May 24, 2012.[76]

We are greatly concerned by the circumstances of the removal as related by Ms. Koser in 2014.[77] Moreover, we were not satisfied with the explanation of P.D., the Children's step-grandmother, regarding those circumstances,[78] and her testimony regarding the status of her daughter, S.G., who is at the center of the controversy, was particularly evasive.[79] S.G.'s mental health and her ability to visit with, let alone care for her two children, though not central to our decision, raised concerns about the oversight and guidance provided by Grandparents themselves.[80] Although Grandparents may be willing to keep Mother away from the Children, they appeared more concerned and defensive of S.G. (and themselves) than they were about the welfare of the Children.

---

[76] N.T. April 24, 2013 at 40 and N.T. June 2, 2014 at 68.
[77] N.T. June 2, 2014 at 74-76 and 80-83. Significantly, there was no testimony on April 24, 2013 about the cause of removal because Grandparents had not intervened in the initial proceeding. Indeed, they were barely mentioned in that proceeding.
[78] N.T. June 20, 2014 at 167-168.
[79] N.T. June 20, 2014 at 184-189
[80] N.T. June 20, 2014 at 184-189

Regarding the removal of the children, in January 2012, CYS became aware of threatening statements by S.G. towards the three children while S.G. was living with Grandparents. A safety plan was established that precluded S.G. from having any contact with the children. At some point, while in the care of S.G., the youngest child, T.D., suffered a broken arm, which was not reported to CYS for several days.[81] After CYS confirmed that S.G. was continuing to have unsupervised contact after the safety plan was in place, the children were placed back into foster care on May 24, 2012.[82] Ms. Koser stressed that the order removing the children was not intended to be permanent but Grandparents took no steps to remedy the situation. In fact S.G. remained in their home until May 2014.[83]

On a positive note, S.D., the initial foster mother and T.D.'s adoptive mother, has permitted Grandparents to remain in contact with T.D. and believes there is a loving bond between Grandparents and the three children.[84] However, her testimony as a whole, confirmed that the Children have serious behavioral and emotional problems between themselves, and keeping them within the umbrella of "family" (by placement or adoption) merely to avoid separating them is a prescription for failure.

We believe that Grandparents love all 6 of their grandchildren, but that love has been failed to meet their grandchildren's needs. Even if Grandparents

---

[81] N.T. June 2, 2014 at 75.
[82] N.T. June 2, 2014 at 75.
[83] N.T. June 2, 2014 at 75-76. We do not excoriate the Grandparents for waiting so long to act, but note that they have been on the periphery of the Children's lives by their own choice.
[84] N.T. June 4, 2014 at 9.

are the only stability the Children have ever known,[85] theirs' is not the stability the Children need. They may be willing, but their fitness is questionable. Rather, the Children need a truly stable family that can provide emotional and physical security for a lifetime. In sum, a goal change to adoption is in their best interests. Further, it is clear that the Children's best chance for a hope and a future is through adoptions by different foster families.

### C. The Termination of Parental Rights

#### 1. Mother

CYS filed for involuntary termination under several provisions of 23 Pa.C.S. § 2511(a) of the Adoption Act. With respect to Mother, we rely on our preceding analysis and find that CYS has met its burden under § 2511(a)(2), (a)(5), and (a)(8). Although the conclusion is simple to reach, in spite of our criticism of Mother, it is not an easy edict to pronounce.

Specifically, with respect to § 2511(a)(2), Mother's "repeated and continued incapacity" is manifest and the causes cannot be remedied by her. Regarding § 2511(a)(5), the Children were removed from her care over 31 months ago, Mother cannot remedy the causes within a reasonable time, if ever, and no additional amount of services will change that. Based on the foregoing discussion, terminating Mother's rights will best serve the needs and welfare of the Children. Finally, with respect to § 2511(a)(8), we merely add that 12 months lapsed long ago.

---

[85] N.T. June 20, 2013 at 164.

### 2. *Father*

During the 31 months between the adjudication of dependency and the hearings in June, Father was incarcerated in Mississippi or Pennsylvania for all but eight months. Now, he is back in the Lamar County Prison serving a 12 month revocation until June 10, 2015.[86] As such, any discussion regarding the termination of Father's parental rights must address the holding of our Supreme Court in *In re R.I.S.*, 36 A.3d 567 (Pa. 2011).

Indeed, were we constrained to "make the call" in April of 2013, the procedural status of our case would have been identical to that in *R.I.S.* Like the court in York County, we would have terminated Mother's rights but found that neither a goal change to adoption nor termination was appropriate with respect to Father. We would have done so based not only on the holding in *R.I.S*, but also on the facts in our case, which are decidedly different than *R.I.S.*

Fourteen months down the road, the posture of our case is categorically different than that of *R.I.S.* First and foremost, rather than push the issue of termination in April 2013, CYS took a step back over the summer months, withdrew their petitions and decided to push the rope of hope instead. Thus, Father was given an opportunity to get his act together and the court was spared from making a difficult call that was magnified by the prospect of splitting up the Children. Unfortunately for Father, we cannot say as the trial court did in *R.I.S.* that "there was nothing that [father] didn't do." *Id.* at 571. To the contrary, we can say that there was nothing that CYS failed to do to assist Father in gaining

---

[86] CYS Exhibit 1, June 20, 2014.

-33-

custody of his children. Instead, it was Father's own continuing criminal and addictive behaviors that thwarted the efforts of CYS.

Father may argue that the length of his revocation sentence is not too long or that the prospect for an early release makes the wait acceptable. Whether he is in for 6, 9 or 12 months, we will not examine the length of the sentence in a vacuum. Because of the wishful thinking of CYS and the court, we already waited 14 months from Father's reappearance in April 2013. After providing this second chance to be a father, to argue that this court is basing its determination solely on Father's incarceration is an affront to reality. As we note in the concluding analysis of the parties' respective bonds, Father never had a relationship with the Children prior to the adjudication of dependency, and did not create one during the six months after his reappearance. The Children have waited over 31 months for permanency — should the court force them to wait for at least 12 more?

We do not doubt that Father has a desire to nurture the Children, but it is driven as much by guilt over his past as it is by any positive desire to help them. The Children need more than a few cards and letters — they need permanency now. We made it very clear to the parents at the August 16, 2013 hearing:

> You have to be open, transparent, and ultimately you have to be honest with yourselves and with the agency for the betterment of your children. If you are not honest, you will not stay sober, you will not stay clean, and [the Children] will have a very difficult road ahead of them.
>
> I am going to enter orders granting the request of the agency to withdraw the termination petitions, and I hope I never see another termination petition with

-34-

either of your children's names on it. That is not in my hands. That is largely in yours.[87]

That opportunity slipped through Father's hands, not by misfortune, but as a direct result of his actions. While the decision is in my hands, the Children will not be forced to wait another 12 months for the gates of prison to swing temporarily open. CYS met its burden under § 2511(a)(2) – Father has never been able to care for the Children, and that will not be remedied.

## D. The Emotional Bonds

Having found that the parental rights must be terminated, the court must engage in a second analysis under § 2511(b), giving "primary consideration to the developmental, physical and emotional needs and welfare of the child." Basically, this analysis "concerns the nature and status of the emotional bond between parent and child." *In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa. Super. 2006). Our analysis in *Section B* of the needs and welfare of the children is relevant to this section as well.

### 1. Father

There is no evidence that Father had a bond with the Children before they were declared to be dependent. After he returned to Pennsylvania in 2013, CYS gave him every opportunity to create one, but he failed to do so. At best, there is some indication that by the later supervised visits, the Children referred to him as daddy.[88] To the extent he was creating a bond, when the visits ended in October 2013 (due to Father's impending probation revocation and bench warrant), the

---

[87] N.T. August 16, 2013 at 33.
[88] N.T. June 20, 2014 at 27.

Children experienced confusion, disappointment and regression.[89] Even if we were to infer from their disappointment that a bond was budding, salvaging that bond would be more harmful to the Children than allowing it to fade in their memories. At this point, A.D. has bonded with his foster father and J.D. is well on her way to doing so. Moreover, unlike Father, these adults are truly able to provide for the developmental, physical and emotional needs of the Children.

### 2. Mother

Mother had bonds with both Children, but the testimony of the counselors and therapists, in particular, make it clear that the bonds are not worth saving. We do not deem these bonds to be "pathological" as our Supreme Court found in *In re T.S.M.*, 71 A.3d 251 (Pa. 2013), but the bonds with Mother are far from healthy. Perpetuating bonds that, among other ills, instill deception over discipline and indifference over integrity is nonsensical. Conversely, the Children will not be harmed by severing the bonds.

### 3. Grandparents

Although the parental bond is the focus of § 2511(b), under the circumstance of this case we will conclude with Grandparents' bond. Because Grandparents have contact with T.D. through her foster parents' informal consent, and because the pre-adoptive resources for the Children recognize the need to maintain contact with the at least the three younger children, the parties should consider informal arrangements or the various options under Act 101. Practically, if all three children are maintaining contact, infusing the Grandparents could be done without exposing any child to harm.

---

[89] N.T. June 20, 2014 at 48.

-36-

Nevertheless, we pause only for a moment before finding that the bonds with Grandparents are not so tight that they cannot be severed without doing harm to the Children. Most importantly, the needs and welfare of the Children will be best served by granting them the permanency they so desperately need. Both are in stable, loving pre-adoptive homes.

## V.    Conclusion

It is not sensible or compatible with the laws or policy of the Commonwealth to require the Children to wait any longer for Mother or Father to summon the responsibility and determination to parent. The goal change to adoption is unmistakably in their best interest. Similarly, CYS has clearly and convincingly demonstrated grounds for termination. The parents have been unable or unwilling to perform their duties and have caused the Children to be without the essential care they require.

Furthermore, given the parents' failure to recognize or admit the causes of their incapacity, their ability to remedy them is obviated. The conditions leading to the placement of the Children continue to exist and neither Mother nor Father can or will be able to remedy them in a reasonable time, if ever. Therefore, we conclude that termination will serve the Children's best interest and will permit their adoption by adults who are willing to provide them the care, stability, nurture and love they require in order to thrive.

By the Court,

_____

Albert H. Masland, J.

-37-

Hilary Vessel, Esquire

Lindsay D. Baird, Esquire

Cindy Villanella, Esquire

John Mangan, Esquire

Joseph Hitchings, Esquire

CASA

:sal